693 A.2d 1173

STATE OF NEW JERSEY, PLAINTIFF/APPELLANT, v. YISROEL
SCHENKOLEWSKI, ABRAHAM PENZER, AND MARTIN
BUCKLEY, DEFENDANTS/RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 13, 1997—Decided April 23, 1997.

116

Before Judges LANDAU, WALLACE and KIMMELMAN.

*Daniel J. Carluccio*, Ocean County Prosecutor, argued the cause for appellant (*Mr. Carluccio*, attorney; *William J. Heisler* and *Ellen M. Torregrossa*, Assistant Prosecutors, and *Mr. Carluccio*, on the brief).

*Alan L. Zegas* argued the cause for respondent Schenkolewski (*Edward J. Dauber* and *Mr. Zegas*, on the joint brief filed with respondents Penzer and Buckley).

*Daniel L. Grossman* argued the cause for respondent Penzer (*Mr. Grossman* and *Novins, York & Pentony*, attorneys; *Robert F. Novins*, of counsel; *Mr. Grossman*, on the joint brief filed with respondents Schenkolewski and Buckley).

*John J. Barry* argued the cause for respondent Buckley (*Barry & McMoran* and *Jerome A. Ballarotto*, attorneys; *Thomas F. Doherty*, of counsel; *Mr. Barry* and *Mr. Ballarotto*, on the joint brief filed with respondents Schenkolewski and Penzer).

The Opinion of the Court was delivered by

WALLACE, J.A.D.

The State appeals from the dismissal of its indictment against three defendants for bribery, official misconduct, and conspiracy. The indictment alleged that defendant Martin Buckley gave a substantial sum of money to defendant Rabbi Yisroel Schenkolewski, purportedly in exchange for the latter's agreement to support a controversial cogeneration facility that Buckley's company was proposing to build in the town of Lakewood. Defendant Schenkolewski was a religious leader in the community who wielded considerable political influence among his constituents, the Orthodox Jewish population of Lakewood. He was also chairman of Lakewood's zoning board. According to the indictment, Buckley's company paid $500,000 to a private religious school of which the Rabbi was the principal in exchange for the promise that the Rabbi would use his influence to have town council approve the sale of land for the project. Defendant Abraham Penzer was Rabbi Schenkolewski's lawyer and confidant in this transaction.

The indictment was dismissed because the Law Division judge found that the evidence before the grand jury did not present a *prima facie* case of either bribery or official misconduct. In

addition, the judge found that the prosecutor had committed various acts of misconduct during the grand jury proceedings, which would have necessitated a dismissal of the indictment on two additional independent grounds.

The State contends that the indictment properly charged the crimes of conspiracy, bribery, and official misconduct and that there was no prosecutorial error in the grand jury proceedings to justify dismissal of the indictment. We hold that the evidence was sufficient to support the indictment for conspiracy, bribery and official misconduct. However, the prosecutor's failure to present information respecting possible bias of several grand jury members to the Assignment Judge mandated dismissal of the indictment. We therefore affirm the judgment dismissing the indictment.

## I

Defendant Schenkolewski is a rabbi and the principal of a girls' religious high school in the town of Lakewood (Township). He was the chairman of the Zoning Board of Adjustment of Lakewood (Zoning Board) and also served as liaison to the Mayor on matters between the Zoning Board and the Planning Board of Lakewood (Planning Board).

In the spring of 1988 the Lakewood Industrial Commission (Industrial Commission), a community organization overseeing the development of the Lakewood Industrial Park, agreed to sell a parcel of land in the park to Edmund Bennett of Airport Associates. Bennett in turn had an agreement to sell the land to Lakewood Cogeneration, (Cogen), a limited partnership made up of CNG Energy, a subsidiary of Consolidated Gas of Pittsburgh, and Hydra–Co Enterprises (Hydra–Co), a subsidiary of Niagara Mohawk Power. Cogen intended to build a cogeneration facility on the land, which would transform natural gas into electricity through the use of turbines and would also generate steam.

Jersey City Power & Light (JCP & L)[1] had agreed to purchase power from Cogen's facility. However, as the land in question was actually owned by the Township, only the Township Committee (Committee) had the ultimate power to authorize its sale.

On December 6, 1988, Cogen filed an application with the Planning Board seeking site plan approval for its proposed project and received approval on February 26, 1989. A contract of sale between the Industrial Commission and Airport Associates for the purchase of the land for $3,676,713.50 was executed on June 23, 1989.

Meanwhile, Cogen tried to gain support for the project. Originally, it was CNG Energy's job to perform the necessary public relations. Kenneth Cuccinelli of CNG Energy met with various groups. Although Cuccinelli did not authorize any contributions, CNG Energy bought a table at a local fundraiser and tickets to Scout dinners, and purchased advertisements in local magazines. In addition, CNG Energy donated $12,500 to the United Way to fund a study to evaluate whether handicapped workers could work in the proposed greenhouse to be located on the property.

Cuccinelli spoke with the president of the Lakewood Residents' Association, who mentioned that Rabbi Schenkolewski was the leader of a large voting bloc and was very influential. Cuccinelli then met with Rabbi Schenkolewski in January 1990 and discussed the benefits of the project to the Township's tax base. Cuccinelli did not sense any opposition by Rabbi Schenkolewski to the project and asked him for whatever support he could give.

Cuccinelli also spoke to each of the Committee members, Robert Singer, Jerry Greenberg, Jose Alonso, John Franklin, and Richard Work, whose votes were needed. Singer, who was also a State senator, told Cuccinelli that the issue was really a political one for him because his constituents were opposed to what they viewed as a trash-burning facility.

---

[1] JCP & L is now known as GPU Energy.

Richard McClelland, a civil engineer for CNG Energy, coordinated the engineering aspects of the proposal. He suggested to Cuccinelli that Rabbi Schenkolewski should meet with Singer since the Rabbi influenced a major voting bloc in town.

As part of the requirements for the approval of a Cogen facility, it was necessary to identify a purchaser for the steam generated by the facility. In this regard, Cogen had secured a grower of hydroponic tomatoes to be the potential purchaser of its steam. Around the same time, the tomato grower filed a variance application with the Zoning Board for approval of this agricultural use on the property. On February 2, 1990, Airport Associates filed an application with the Planning Board for preliminary and final site plan approval for a horticultural production facility.

The Committee rejected the transfer of the land to the Industrial Commission on April 26, 1990 by a vote of 3 to 2, with Singer, Greenberg, and Franklin voting no. On May 17, 1990, Airport Associates filed suit in the Superior Court against the Township seeking to compel transfer of the land.

Although CNG Energy decided not to spend any more money on the project after the Committee's decision, defendant Martin Buckley of Hydra–Co began to take a more active role. Buckley was responsible for developing the Cogen project. He had broad authority to engage in contract negotiations, community relations, and financing.

In early June 1990 Cuccinelli and Buckley met with Rabbi Schenkolewski and defendant Abraham Penzer, who described his role as that of "assistant" to the Rabbi. Rabbi Schenkolewski and Penzer said they would think about ideas to move the project forward. Penzer stressed that Rabbi Schenkolewski was quite influential in the community.

A few days later at a Hydra–Co board meeting, Buckley mentioned the community opposition to the project and his meeting with Rabbi Schenkolewski. Irvin Mermelstein, vice president and general counsel of Hydra–Co, offered to meet with Rabbi Schen-

kolewski because Mermelstein had a cousin who had been head of a rabbinical college in Lakewood. At that time, Mermelstein did not know that Rabbi Schenkolewski was a member of the Zoning Board.

In preparation for Mermelstein's meeting with Rabbi Schenkolewski, McClelland drafted a memo with possible "discussion points." He noted specific questions that Mermelstein should ask the Rabbi, including what avenues could be used to influence the Township to settle, whether the Rabbi would be willing to be in a position to broker negotiations for a foundation or building fund, whether the Rabbi believed the Township would appeal if it lost the lawsuit, what the viability of the Township Committee would be after the next election, and who was influencing Committee member Greenberg.

Mermelstein met with Rabbi Schenkolewski on June 13, 1990. He solicited information from the Rabbi about the community and its views towards the project. Rabbi Schenkolewski told Mermelstein about the large population of Orthodox Jews and senior citizens. According to the Rabbi, the Jewish population was neutral-to-positive about the project, but the senior citizens and the neighboring citizens of Brick Township were opposed to it. Rabbi Schenkolewski advised Mermelstein to contact the senior citizens directly to address their health concerns and to meet with the Township Committee. Rabbi Schenkolewski did not ask Mermelstein for any compensation, and the subject of contributions was never discussed.

The hearings before the Zoning Board on the tomato grower's variance application continued. Rabbi Schenkolewski, as chairman of the Zoning Board, participated in these hearings. On June 14, 1990, the Zoning Board approved the variance application, conditioned upon the tomato grower's agreement not to purchase steam from Cogen. Rabbi Schenkolewski voted in favor of this resolution.

In September 1990, Thomas Kelaher was contacted by John Halleran, counsel for Cogen, regarding a possible settlement.

Because the Township's attorney Dominick Manco had a conflict of interest, Kelaher had been selected to represent the Township in defending against Airport Associates' complaint. On September 6, 1990, the Township Committee, the Mayor, Township Manager Thomas LaPointe, Manco, Halleran, Cuccinelli, and defendant Buckley met to discuss possible settlement.

There was discussion about Cogen making a "seven-figure" contribution to the Township as a "capital project need," and a separate monetary contribution being made to the residents of Original Leisure Village and Leisure Village East. Kelaher thought that there was nothing illegal about the contribution to the Township because it was considered a "host community benefit." Township Manager LaPointe explained that a "host community benefit" was one that accrued to the benefit of the entire population of the Township. He stressed that such a contribution would have to be made publicly following the passage of a resolution and that all conditions for its acceptance would have to be spelled out. Halleran thought that the monetary offer would be legal, as part of the price of settling litigation. Cogen also offered to make certain physical modifications to its proposed facility. The Township ultimately rejected Cogen's offer.

In coordinating a meeting with the residents of both Leisure Villages, Rabbi Schenkolewski assisted Mermelstein, and as a good faith gesture, Mermelstein offered a gift of $5,000 to the charity of the Rabbi's choice. The Rabbi gave Mermelstein the name of a religious school attended by his son to be the recipient of the gift. Mermelstein did not ask Rabbi Schenkolewski for anything in exchange for the contribution. On November 2, 1990, the designated school, Yeshiva Tiffereth Torah, received a $5,000 check from Hydra–Co.

At about this time, Buckley offered $300,000 to Rabbi Schenkolewski to use for his Bais Kaila School. Rabbi Schenkolewski and Penzer suggested the amount should be $1,000,000. At a subsequent meeting, Buckley agreed to increase his offer to $500,000 in exchange for Rabbi Schenkolewski's and Penzer's agreement to

secure the necessary government approval for the project. A promissory note was prepared at the request of Penzer. Later Mermelstein revised the note to make the offer of payment expressly conditioned upon the transfer of the land that was the subject of the law suit.

On November 14, 1990, Buckley sent an internal memo to the other principal players in the project via a routing slip so that a memo "of this nature" would not be left "floating around." He noted that the company's consultants believed that the company's "local contact with a 'religious leader' [was] already paying off" because, for the first time, no one at the town council meeting made any statement opposing the project. Buckley stated that it was "a sign to many that he has already had some discussions."

On December 7, 1990, McClelland received a memo from Bill Keisling, a public relations consultant, cautioning the company:

Although you believe it unlikely that it would ever become public knowledge that one of the religious/civic leaders in the community is actively working for township approval of the project, if it does become known, you could have an unholy mess on your hands.

It will be important that he and you can honestly say that he is but exercising his right as a citizen to take an interest in a public-policy question. Certainly, he is not being paid to do so. Any contribution the project may be making to a cause which that leader happens to hold dear, should be structured in such a way that there is no quid pro quo between his activities and the contribution.

In January 1991, the Township was granted partial summary judgment in the lawsuit brought by Airport Associates. The Law Division judge concluded that the Township was not obligated to convey the property to Airport Associates, but left open the estoppel issue. According to Kelaher, settlement negotiations between the Township and Cogen continued.

On February 25, 1991, Cuccinelli wrote a memo to Buckley suggesting arguments for Rabbi Schenkolewski to use in gathering support for the project. This memo may have been prompted by a newspaper article detailing the Township's budgetary problems. Cuccinelli felt that the cogeneration facility, a significant tax ratable, could be offered as the solution.

On March 19, 1991, Buckley wrote to the Rabbi asking to meet with him on March 21, 1991 to discuss the settlement meeting. On March 22, 1991, Halleran sent a two-page letter to Rabbi Schenkolewski, enclosing (1) a complete set of the amended site plans for the cogeneration project pending before the planning board; (2) a copy of a tax analysis prepared by Township Manager LaPointe addressing the revenues to be generated by the facility; and (3) a copy of the original settlement agreement previously rejected by the Township in September 1990. Halleran informed the Rabbi that his client was prepared to guarantee the Township a minimum payment in lieu of taxes and to create an oversight committee with advisory and review functions. Further, Cogen was investigating ways to decrease reliance on oil as a backup fuel.

Halleran sent these materials because the Rabbi needed the information to explore with the individual Township Committee members the basis for settlement. Buckley did not tell Halleran about any money being offered to the Rabbi, and Halleran believed that the Rabbi was involved because he was a man of influence and enjoyed being in the center of things. Halleran never received any response from the Rabbi and never had any conversation with him.

On March 25, 1991, Halleran wrote a letter to his client and all the other principal players in the cogeneration project. This letter brought the parties up to date on the agenda for April. Halleran concluded his letter by stating that, "[t]he most immediate date of April 1st may be appropriate to adjourn based upon the Rabbi's involvement in connection with our settlement proposal." Halleran claimed that he was not aware of any money being paid to the Rabbi when he wrote this letter. Nevertheless, Halleran admitted that during the months of March and April, he was aware of consistent and continuing communications between Rabbi Schenkolewski and Buckley.

Trial on the estoppel issue in the lawsuit was scheduled for April 29, 1991. Prior to that date, Kelaher was away on vacation in Virginia. When he called his office, he was told to call Penzer.

Kelaher called Penzer, who told him that the case might be settled and asked if Kelaher objected to an adjournment. Kelaher said he did not. Penzer said he would talk to the judge handling the case. Ultimately, Penzer succeeded in getting a one-week adjournment. Kelaher assumed that Penzer was speaking on behalf of the entire governing body.

According to Halleran, Buckley had spoken to Rabbi Schenkolewski, and the Rabbi agreed to speak to the members of the Township Committee regarding a settlement. Buckley did not tell Halleran about any money being offered.

Of the five Committee members, Franklin was opposed to the facility "no matter what," while the Mayor and Committee member Work were disqualified from voting because of their employment with JCP & L. Since three out of five votes were needed, the settlement could not be reached unless Committee members Singer, Greenberg, and Alonso all approved it. Singer previously had voted against the land transfer because of his constituents' environmental concerns.

The Rabbi claimed that he had talked to Singer and that he was proposing to create a new legislative district for Singer so that Brick Township, where many opponents to the project resided, would no longer be included in Singer's district. Apparently, that effort was successful.

Around that time, Rabbi Schenkolewski and Penzer were given code names: Rabbi Schenkolewski was "The Lone Ranger" and Penzer was "Tonto." On April 24, 1991, McClelland wrote to Buckley explaining that there were "some serious gaps in ... Plan A strategy" by the "Lone Ranger," which needed to be straightened out. In particular, he noted that the "current Plan A as likely understood, and promised, by the Lone Ranger does not seem consistent with the promised '*definitive vote*'" and also that the plan "poses some very significant 'mind-changing' shortcomings and further schedule risks."

The original Plan A strategy was to have the land transfer ordinance read on May 2 and to have the final vote taken on May 23. McClelland believed that this time period would expose the Committee members to public attack on the proposal. This, in turn, would increase the chances that any one of the three members whose votes were needed might change his mind. McClelland noted that "[t]his does not seem consistent with the definitive comfort promised by the Lone Ranger for May 2nd." McClelland urged a different strategy whereby the Committee would vote on the settlement as quickly as possible and then immediately file a stipulation with the court.

On April 25, 1991, McClelland sent a fax to Buckley advising him to "talk to the Lone Ranger to make certain the trio remains lined up to do 'whatever-it-takes' on May 2nd." McClelland explained that the "trio" consisted of Committee members Singer, Greenberg, and Alonso. McClelland assumed that Rabbi Schenkolewski was "lining up" these three. McClelland later learned that the Rabbi met with Greenberg.

On April 29, 1991, a settlement conference took place among Kelaher, Halleran, and LaPointe. Kelaher assumed that LaPointe had been in touch with the Township Committee and that the Committee wanted to settle. The discussion centered around the physical changes to the plant that Cogen was willing to make. In addition, they discussed an increase in the purchase price for the land, the establishment of an environmental watchdog commission, and the guarantee of a minimum payment for taxes. There was no discussion of any payments to third parties.

According to Halleran, at this April 29 meeting, the three men worked out the financial details since most of the physical changes to the facility had already been negotiated. LaPointe told Halleran that there were three affirmative votes on the Township Committee, namely, Greenberg, Singer, and Alonso. Halleran recalled no reference to any contributions to the rabbinical community.

According to LaPointe, Greenberg told him several days before this meeting that he and Singer would vote for the land transfer. LaPointe said that Greenberg was concerned about his position reversal and asked him to draft a statement in support of the project, specifically pointing out the concessions that Cogen had made. Greenberg told LaPointe that Cogen was making donations to both the Leisure Villages and the rabbinical community but he did not specify how much. LaPointe cautioned that any donation should be structured by an attorney.

On April 30, 1991, Halleran drafted a memo to his clients setting forth what had transpired at the April 29 meeting. Halleran stated that LaPointe believed there were three affirmative votes and was "fully aware of our 'behind the scenes activities' in respect of 'community groups.'" LaPointe made it clear that whatever arrangements existed between Cogen and these groups were not to be part of the settlement agreement with the Township Committee. Halleran then set forth what was likely to transpire at the Committee meeting on May 2. Halleran noted that Singer was "'shaky,' although it [was] strongly believed that he [would] adhere to the wishes of the leaders of the Orthodox community."

At the Township Committee meeting on May 2, 1991, Greenberg first read his position paper which LaPointe had drafted. Greenberg, Singer, and Alonso then voted in favor of the settlement proposal permitting the sale of the land and the project to proceed. The lawsuit was dismissed the following day.

The settlement agreement provided that Cogen would establish a two-million-dollar escrow fund for twenty years, with the Township to get the interest thereon. In addition, Cogen would pay at least $600,000 each year in lieu of taxes, $20,000 towards the Township's litigation expenses, and an additional $500,000 for the purchase price of the land.

Singer testified before the grand jury that Greenberg had approached him and asked whether he would keep an open mind on the proposal. Singer said that he never promised that he would vote for the settlement "no matter what" and that he never

committed to anything before the May 2 meeting. Singer was not aware how the financial terms of the settlement were developed and did not know who negotiated the terms. His concern was primarily with the environmental issues. According to Singer, defendants Schenkolewski and Penzer told him only that they saw no down sides to the project.

Alonso testified before the grand jury that no one ever solicited his vote. However, he acknowledged that he had spoken to Rabbi Schenkolewski. The Rabbi expressed his concern with taxes in the community and with the proposed project. Alonso said that Rabbi Schenkolewski wanted to know what Alonso knew about the project's safety and its ability to generate revenue for the town. Alonso agreed to look into it. Alonso also spoke with the Rabbi about the possibility that the Township might get additional money for the land. Alonso claimed that he decided to vote in favor of the settlement because of the environmental changes and because it meant additional revenue for the Township. Further, he had considered that other government agencies had given their approval for this type of facility. In short, Alonso believed he was doing the best thing for the Township.

Greenberg testified before the grand jury that he was an associate and acquaintance of Rabbi Schenkolewski's Hasidic community, but not a "member" of it. He did not consider the Rabbi to be his spiritual adviser, even though the Rabbi had supported Greenberg politically over the years. Greenberg also claimed that the Rabbi's support was sought out by all candidates for public office, from the "Governor on down." Greenberg had sought the Rabbi's support when he ran for Township Committee. He talked to the Rabbi two to three times a week, sometimes about issues pending before the Committee. Penzer and Rabbi Schenkolewski were very close, and Penzer had also done legal work for Greenberg. Greenberg estimated that he had spoken to Penzer about the Cogen project approximately fifty to seventy times. He later realized that Penzer was "lobbying" him for his support.

According to Greenberg, he voted against the original land transfer and against the original settlement offer because of safety and environmental concerns, not because of political considerations. Greenberg maintained that he never met with the developer to work out a settlement, but that he "may have" met with Penzer and Kelaher to discuss a settlement. Nevertheless, Penzer had no "role" in this; his concern was only with lowering the Township's tax rate. The same held true for Greenberg's discussions with Rabbi Schenkolewski; that is, the Rabbi was concerned about taxes. However, Greenberg admitted that the Rabbi's and Penzer's first concerns were with their own Hasidic communities and that the Township at large was their second priority.

Greenberg claimed that Penzer and the Rabbi would never tell him to vote a certain way because they knew that he did only what was right for the community. Greenberg said that, after Singer and Alonso told him that they were in favor of the project, he told LaPointe to work out a settlement. Greenberg stated that he was not aware of the Rabbi's role in the settlement discussions. Greenberg insisted that there was no "lining up" of votes by the Rabbi and that he knew nothing of contributions being made to the Rabbi's school. He did not believe that Singer would adhere to the wishes of the Orthodox community.

Evelyn Feigin, who used to sit on the Planning Board with Greenberg, testified that Greenberg was very close with Rabbi Schenkolewski and that Greenberg served as an "interlocutory" for the Rabbi and the rest of the community. She said that the Rabbi was a very powerful figure in the community and that without the Rabbi's backing, no one could even serve on the school board.

Edmund Bennett, the principal in Airport Associates, who was negotiating the land portion of the deal, testified that Greenberg was the council member who was the closest to Rabbi Schenkolewski and Penzer. He also stated that Penzer often alluded to the "great control" he exerted over such agencies as the Zoning Board, the Planning Board, and the Township Committee. When

Buckley told Bennett that a settlement was near, both the Rabbi's and Penzer's names were mentioned.

Mermelstein said that he received a call on May 17, 1991 asking him to draw up a document which would confirm in writing that Cogen had promised to make a contribution of $500,000 to the religious school where Rabbi Schenkolewski was the principal. Mermelstein claimed that this was the first he knew of such an agreement. Mermelstein also said that Penzer sent him a draft which was essentially an unconditional promise to pay the money. Mermelstein found such a document to be unacceptable and revised the note to make it conditional upon final approval of the project and returned it to Penzer.

In July 1991, Hydra–Co sent a check for $50,000 to the Rabbi, payable to the Rabbi's school. Rabbi Schenkolewski requested a small up-front payment after the settlement was approved because his school was having cash-flow problems and owed him back salary. At about that time, the Planning Board approved the site plan extension for the cogeneration plant.

In August 1991, Halleran wrote to the Zoning Board asking that the prohibition respecting purchase of steam be removed from the variance that had been granted to the tomato grower in June 1990. A hearing was held by the Zoning Board on September 5, 1991. According to the minutes of that meeting, Cogen sought only an extension of the variance and made no mention of removing the condition. The request was granted. The minutes showed that Chairman Rabbi Schenkolewski was absent from the meeting until after the vote was recorded. No explanation was given for his absence. The following day, Halleran wrote to his clients and explained that prior to the Zoning Board meeting he had received a call from Penzer, a "confidant" of Rabbi Schenkolewski, who urged that Halleran seek only the extension of the variance and that he not press for removal of the steam condition.

While I was not inclined to do so the events occurring upstairs in Town Hall just prior to the commencement of the Board of Adjustment meeting (the Franklin political party switch) convinced me that it was probably the wise thing to do. In addition, for whatever reason, Rabbi Schenkolewski was not present to chair the

meeting. Accordingly, we secured the extension of the use variance ... and carried the balance of the application dealing with the elimination of the fueling until ... November 7, 1991.

On January 2, 1992, the Zoning Board met again. The minutes reflects that Rabbi Schenkolewski was present at 8:07 p.m. but was called out of the meeting at 8:15 p.m. Cogen's application for removal of the steam prohibition was presented and voted upon during the Rabbi's absence. The application was granted. Shortly thereafter, the Rabbi returned to chair the balance of the meeting. No explanation was given for his brief absence.

In October 1992, Cogen made substantial contributions to the retirement communities of Lakewood. According to George Manfredi, a member of the board of Leisure Village East, he met with McClelland and Cuccinelli regarding the proposed project. These men made a presentation to Leisure Village East, a group of 2,000 residents. The residents remained neutral regarding the project, mostly because the project was not visible from their neighborhood. Manfredi never heard of any suggestion of money being contributed and did not see how his group could actually help to get the project approved.

Nevertheless, when Cogen offered Leisure Village East $100,-000, Manfredi accepted the offer and requested that the money be clear of taxes. Accordingly, they agreed on an amount of $158,-000. Cogen called it a corporate gift to a host community. Manfredi claimed that it was not in consideration for his group's neutral stand and that he never met with Greenberg to talk about a settlement of the litigation.

Betty Renk was a member of the Board of Trustees of Original Leisure Village, another retirement community of about 3,400 residents. This community conducted two separate surveys of its residents about the Cogen project. Although less than half of the residents participated, the majority voted against the project. In October 1992, Renk said she received a telephone call from Buckley who offered a gift of $100,000 in conjunction with the

upcoming ground-breaking ceremony. Renk told him it would have to be voted on by the board. The board voted to accept it.

The project's financial closing occurred on November 9, 1992. The following day, $100,000 was paid to Original Leisure Village and $158,000 was paid to Leisure Village East. On November 12, 1992, Cogen wired $450,000 to a special bank account in Freehold, newly opened in the name of Bais Kaila, the Rabbi's school. On March 10, 1993, Cogen paid another $5,000 to the school.

The contributions eventually were reported in the local newspapers. Township Manager LaPointe stated he was surprised to read that the elected officials were claiming they had no knowledge of these donations. LaPointe was also surprised to learn that a donation had been made to Rabbi Schenkolewski's school because he had assumed that the donation had been made to the rabbinical community at large.

At least two other people in the community were surprised to learn that the Committee members were denying knowledge of the gifts. Lucille Turtora, LaPointe's secretary, also worked for the Township Committee and for the mayor. LaPointe had told her that the Committee had changed its mind about the project because donations had been made to the senior citizens' villages and to the Yeshiva community. Also, Turtora claimed that, prior to the vote on the settlement, Rabbi Schenkolewski and Penzer had been in LaPointe's office quite frequently, along with the mayor and other members of the Committee. Greenberg, in particular, was constantly talking to LaPointe. Hence, Turtora was surprised that these members were denying prior knowledge of any gifts.

Evelyn Feigin, who knew Greenberg from the Planning Board, also expressed surprise. According to Feigin, Greenberg had told her about contributions being received by the Rabbi in connection with the Cogen project. She believed that he had told her this before the May 1991 settlement and much before the story hit the newspapers. In any event, after the story broke, Greenberg telephoned Feigin to tell her that he knew nothing about the

contributions. In light of his earlier conversations with her, Feigin was surprised that he was taking this position.

The grand jury returned an indictment against Rabbi Schenkolewski, Penzer, Buckley, and the corporate defendants, charging them with bribery, official misconduct, and conspiracy. As noted above, the indictment was ultimately dismissed by the Law Division judge. This appeal followed.

## II

With this background, we address the State's claim that the indictments were sufficient. Initially, we note that indictments are presumed valid and should be dismissed only upon the clearest and plainest ground and only if palpably defective. *State v. New Jersey Trade Waste Ass'n*, 96 *N.J.* 8, 18–19, 472 *A.2d* 1050 (1984); *State v. Weleck*, 10 *N.J.* 355, 364, 91 *A.2d* 751 (1952); *State v. Engel*, 249 *N.J.Super.* 336, 359–60, 592 *A.2d* 572 (App.Div.), *certif. denied*, 130 *N.J.* 393, 614 *A.2d* 616 (1991). As long as an indictment alleges all of the essential facts of the crime, the charge is deemed sufficiently stated. *State v. New Jersey Trade Waste, supra*, 96 *N.J.* at 19, 472 *A.2d* 1050; *State v. La Fera*, 35 *N.J.* 75, 81, 171 *A.2d* 311 (1961). However, even if an indictment appears sufficient on its face, it cannot stand if the State failed to present the grand jury with at least "some evidence" as to each element of its prima facie case. The quantum of this evidence, though, need not be great. *State v. Bennett*, 194 *N.J.Super.* 231, 234, 476 *A.2d* 833 (App.Div.1984).

> In determining the sufficiency of the evidence to sustain the indictment, every reasonable inference is to be given to the State. Further, the evidence need not be sufficient to sustain a conviction, but merely sufficient to determine that there is *prima facie* evidence to establish that a crime has been committed.
>
> [*State v. New Jersey Trade Waste, supra*, 96 *N.J.* at 27, 472 *A.2d* 1050.]

Applying these principles, we find sufficient evidence to sustain the indictment. Second degree bribery is defined in part as follows:

> A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or

b. Any benefit as consideration for a decision, vote, recommendation or exercise of official discretion in a judicial or administrative proceeding; or

c. Any benefit as consideration for a violation of an official duty of a public servant or party official; or

d. Any benefit as consideration for the performance of official duties.

For the purposes of this section "benefit as consideration" shall be deemed to mean any benefit not authorized by law.

It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, or lacked jurisdiction, or for any other reason.

In any prosecution under this section of an actor who offered, conferred or agreed to confer, or who solicited, accepted or agreed to accept a benefit, it is no defense that he did so as a result of conduct by another constituting theft by extortion or coercion or an attempt to commit either of those crimes.

[*N.J.S.A.* 2C:27–2.]

Count two of the indictment charged that Cogen, through defendant Buckley, knowingly offered, agreed to confer and did confer upon defendant Schenkolewski, chairman of the Zoning Board, and defendant Penzer a benefit, that is, $500,000 to Bais Kaila High School. It also charged that defendants Schenkolewski and Penzer solicited, agreed to accept, and accepted that "benefit as consideration for the decision, opinion, recommendation, vote and exercise of discretion of a public servant on a public issue." In other words, defendants Schenkolewski and Penzer were benefitted in exchange for using their political influence to secure the vote of the Lakewood Township Committee to settle the lawsuit and transfer the land for the construction of Cogen's facility as chairman of the Zoning Board and as liaison to the Planning Board. Particularly, it was charged that defendant Schenkolewski violated his official duties as a public servant.

■ Under *N.J.S.A.* 2C:27–2, neither the offeror nor the recipient of the bribe need be a public official to prove bribery. Rather, it is sufficient if the recipient created the understanding with the briber that he could influence matters in connection with an official duty, whether or not he was capable of actually effecting

such an act. *See State v. Ferro*, 128 *N.J.Super.* 353, 358, 320 *A.*2d 177 (App.Div.), *certif. denied*, 65 *N.J.* 566, 325 *A.*2d 700 (1974); *State v. Sherwin*, 127 *N.J.Super.* 370, 385, 317 *A.*2d 414 (App.Div.), *certif. denied*, 65 *N.J.* 569, 325 *A.*2d 703, *cert. dismissed*, 419 *U.S.* 801, 95 *S.Ct.* 9, 42 *L.Ed.*2d 32 (1974) (statute does not require that "the person receiving the bribe do so 'under color of his office' "). Both *Ferro* and *Sherwin* involved the former bribery statute *N.J.S.A.* 2A:93–6 which prohibited any person from directly or indirectly from giving or receiving any thing of value as a bribe, present or reward to obtain, secure approval or disapproval or any other act or thing connected with the government. This is very similar to our current bribery statute. *N.J.S.A.* 2C:27–2.

While penal statutes must be strictly construed, such construction does not prevent the court from reading a statute in relation to the evil sought to be eradicated or from giving effect to the terms of the statute which will accord with their fair and natural meaning. *State v. Ferro, supra,* 128 *N.J.Super.* at 357, 320 *A.*2d 177. In *Ferro*, we noted that *N.J.S.A.* 2A:93–6 was designed to broaden the offense of common law bribery so as to include the peddling of influence by a person in an apparent position of access to a public official. *Id.* at 359, 320 *A.*2d 177. The Legislature intended to proscribe conduct which was not penalized by the common law and which "denigrates the integrity of our public institutions." *Id.* at 360, 320 *A.*2d 177.

The language of the current *N.J.S.A.* 2C:27–2 is just as broad and was intended to be so. *See State v. Scirrotto*, 115 *N.J.* 38, 45–46, 556 *A.*2d 1195 (1989); Cannel, *Criminal Code Annotated,* comment 3 on *N.J.S.A.* 2C:27–2 (1996–97). In *United States v. Traitz*, 871 *F.*2d 368, 384 (3d Cir.), *cert. denied*, 493 *U.S.* 821, 110 *S.Ct.* 78, 107 *L.Ed.*2d 44 (1989), this statute was the predicate offense for a federal RICO conviction. The defendant contended that the judge had erred in failing to charge the jury that they had to find that an agreement existed between the briber and the bribee. The Third Circuit concluded that the "benefit in consideration" language of *N.J.S.A.* 2C:27–2 created the requirement only

of a subjective intent on the part of the actor who was being charged with either accepting or conferring the benefit; it did not require mutual assent. 871 *F*.2d at 385. Each actor must be judged by what he thought he was doing and what he meant to do, not by how his actions were viewed by the other party. *Id.* at 386. We agree.

■ Applying these standards here, there was substantial evidence that defendant Buckley paid the money for the benefit of defendant Schenkolewski in exchange for a "promised" or "definitive" vote on the Township Committee. A factfinder could reasonably conclude that Buckley paid $500,000 to a school headed by Rabbi Schenkolewski, which paid his salary, as a consideration for the Rabbi using his influence to insure favorable action by the three Committee members whose votes were necessary. Thus, there was sufficient evidence to sustain the bribery charge against Buckley.

■ The evidence against defendants Schenkolewski and Penzer was also sufficient to sustain an indictment for bribery. It could be interpreted to show that Rabbi Schenkolewski received a benefit. Although the $500,000 was paid to his school, it would enable him to receive the benefit of backpay. In addition, the money would relieve him of otherwise onerous fundraising activities because it constituted the operating budget for his school for almost one full year. Defendant Penzer could reasonably be deemed an accomplice, since he admitted that he encouraged the Rabbi to ask for more than the $300,000 initially offered by Buckley. There was evidence that he insisted that a note be given and that he prepared a draft note. As set forth in the final draft of the note, the money would only be paid if the sale of the land to Cogen was consummated.

The more difficult issue is whether the money was tendered in consideration for official action. The State presented considerable evidence tending to show that Greenberg and defendants Schenkolewski and Penzer were quite close, that they spoke often on political matters, and that these discussions centered around is-

sues pending before the Township Committee, including the Cogen project. In short, Greenberg's political career may have been closely connected to the Rabbi and to the political community which the Rabbi represented.

The evidence also tended to show that, initially, Greenberg had no strong feelings one way or the other about the project. Greenberg changed his vote about the project, not after concessions were made by the developer or after the developer offered the Township more money, but after additional money was offered to the Rabbi for his school. Although he claimed later that he did not know about this money, the testimony of other witnesses disputed this claim.

Defendants Schenkolewski and Penzer nevertheless claim that they took the money only to "lobby" the Committee members on how to vote. Such a claim, however, would be for a jury to determine at trial. That is, it would be for the jury to decide with what subjective intent these defendants accepted the money. Moreover, the raising of this claim on a motion to dismiss an indictment does not convert defendants' otherwise criminal behavior into protected First Amendment activity. *See United States v. Anderson*, 509 *F.*2d 312, 329–30 (D.C.Cir.1974), *cert. denied*, 420 *U.S.* 991, 95 *S.Ct.* 1427, 43 *L.Ed.*2d 672 (1975).

While there is no claim that defendants Schenkolewski and Penzer ever offered anything of benefit to Greenberg or any other Committee member in exchange for his vote, such proof was not necessary to satisfy the elements of bribery. *See N.J.S.A.* 2C:27–2. The proofs were sufficient to show that these defendants accepted a benefit in exchange for their promise or agreement to influence official action. Consequently, it was error to dismiss the bribery count against defendants Schenkolewski, Penzer, and Buckley.

Further, we find no support for the proposition that because the Legislature enacted, but then immediately repealed *N.J.S.A.* 2C:27–8, dealing with selling political endorsements and

exerting special influence, it must have intended to decriminalize the type of behavior engaged in by these defendants. This section was repealed "as unnecessary and overly broad." Cannel, *supra*, comment on *N.J.S.A.* 2C:27–8. The subsection dealing with the sale of special influence, in particular, was limited to exploitation of "special" influence so as "not to prejudice the legitimate activities of lawyers and other professional representatives." Cannel, *supra*, comment on *N.J.S.A.* 2C:27–8 (the 1971 Code Commentary).

Defendants also maintain that they did not know that what they did was against the law. However, the Legislature can make the doing of an act criminal or penal, regardless of one's knowledge of the illegal character of the act. *State v. Hanly*, 127 *N.J.Super.* 436, 444, 317 *A.*2d 746 (App.Div.), *certif. denied*, 65 *N.J.* 578, 325 *A.*2d 711 (1974). The statute was not so vague either facially or as applied that persons of common intelligence had to guess at the meaning of the terms of this statute. *See State v. Maldonado*, 137 *N.J.* 536, 563, 645 *A.*2d 1165 (1994). Here, defendants' conduct in keeping secret the terms of their deal, for example, by Buckley's use of code names for the Rabbi and Penzer and by the Rabbi's establishing of separate bank accounts for the money, may lead a jury to conclude that they did understand the wrongfulness of their behavior. *See State v. Roth*, 289 *N.J.Super.* 152, 163, 673 *A.*2d 285 (App.Div.) (noting that defendant's "manifestation of paranoia establishes that [he] was sufficiently aware that his conduct crossed the line between legitimate and illegitimate economic coercion"), *certif. denied*, 146 *N.J.* 68, 679 *A.*2d 655 (1996).

## III

We turn now to the count for official misconduct. *N.J.S.A.* 2C:30–2 provides in part:

> A public servant is guilty of misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:

a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or

b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

The crime has three separate elements: (1) that the defendant is a public servant; (2) that he committed an act relating to his office knowing it was unauthorized; and (3) that he did so with the purpose to benefit himself or another. *State v. Bullock*, 136 *N.J.* 149, 153, 642 *A.2d* 397 (1994); *State v. Vickery*, 275 *N.J.Super.* 648, 651, 646 *A.2d* 1159 (Law Div.1994).

Misconduct in office thus occurs when there is an act or omission in breach of a duty of public concern by one who has accepted public office. *State v. Maioranna*, 225 *N.J.Super.* 365, 369, 542 *A.2d* 510 (Law Div.1988), *aff'd*, 240 *N.J.Super.* 352, 573 *A.2d* 475 (App.Div.1990), *certif. denied*, 127 *N.J.* 327, 604 *A.2d* 601 (1991). Official functions include those duties which are imposed by law as well as those which are clearly inherent in and naturally arise from the nature of the office. *State v. Lore*, 197 *N.J.Super.* 277, 282, 484 *A.2d* 1259 (App.Div.1984); *State v. Maioranna*, *supra*, 225 *N.J.Super.* at 371, 542 *A.2d* 510. To determine whether an act sufficiently relates to a defendant's office to constitute official misconduct, a court must look to the scope of the defendant's apparent authority. *State v. Bullock*, *supra*, 136 *N.J.* at 156, 642 *A.2d* 397. Nothing in the statute, however, suggests that the underlying act must be criminal in nature; that is, charges of official misconduct may be sustained even without proof of a criminal act. *State v. Parker*, 124 *N.J.* 628, 640, 592 *A.2d* 228 (1991), *cert. denied*, 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.2d* 625 (1992).

Here, there is no dispute that Rabbi Schenkolewski, as chairman of the Zoning Board and liaison to the Planning Board, was a public servant. While defendants Buckley and Penzer were not public servants, it is clear that an accomplice or co-conspirator to the offense of official misconduct need not be a public servant. *See State v. Hinds*, 143 *N.J.* 540, 550, 674 *A.2d* 161 (1996); *State v.*

*Bryant,* 257 *N.J.Super.* 63, 66–67, 607 *A.2d* 1343 (App.Div.1992). Hence, defendants Buckley and Penzer could be found to be co-conspirators or accomplices.

 Nor is there any dispute concerning the benefit received. In fact, the official misconduct statute is somewhat broader than the bribery statute in this regard because the misconduct statute states that the benefit can be obtained for the actor or "another." *N.J.S.A.* 2C:30–2.

 The essential questions are whether the act related to a public office and whether the actors knew that the act was unauthorized. The crime is not proven by showing misconduct committed by a person who happens to be a public officer; that is, the misconduct must be connected to that person's official duties. *State v. Weleck, supra,* 10 *N.J.* 355, 365, 91 *A.2d* 751 (1952). Moreover, the indictment charging official misconduct must allege both the prescribed duty of the office and facts constituting a breach thereof. The duties of office may arise by some special law or provision of municipal charter, may be imposed by an act of the Legislature, or may arise out of the nature of the office itself. *Id.* at 366, 91 *A.2d* 751.

Here, count three of the indictment alleged that defendant Schenkolewski did, with a purpose to obtain a benefit for himself and/or another, commit acts relating to his office in an unautho-rized manner and did knowingly refrain from performing duties which were imposed upon him by law and were clearly inherent in the nature of his office. Specifically, the indictment alleges that defendant Schenkolewski:

> [H]aving functions and duties among others to display good faith, honesty, and integrity, to be impervious to corrupting influences, to conduct himself with undivided loyalty to the public trust, and to refrain from activities which interfere with the proper discharge of his duties, at the behest of the defendants and other co-conspirators, did, acting with the purpose to obtain a benefit for himself and another, solicit, agree to accept, and accept money in an amount in excess of 500,000 dollars from [Cogen] ... with the assistance of [defendants] Martin Buckley and Abraham Penzer, in exchange for Yisroel Schenkolewski's exercise of influence over the Lakewood Township Committee's decision to settle the lawsuit and transfer land owned by the Township to [Cogen] to build a cogeneration plant

... while matters directly relevant to the cogeneration plant were pending before the Zoning Board....

A public official is disqualified from participating in quasi-judicial proceedings in which one has a conflicting interest that may interfere with the impartial performance of the duties as members of a public body. *Petrick v. Planning Bd. of Jersey City*, 287 *N.J.Super.* 325, 329, 671 *A.*2d 140 (App.Div.1996). Moreover, a zoning board member who is disqualified from voting may not use his office, and whatever influence he may wield, to influence the votes of the other members. That is, it is insufficient to decline to vote while still seeking to influence what the vote will be; such conduct requires a vacating of the zoning resolution. *Darrell v. Governing Body of Clark Township*, 169 *N.J.Super.* 127, 132, 404 *A.*2d 346 (App.Div.1979), *aff'd o.b.*, 82 *N.J.* 426, 413 *A.*2d 610 (1980). Furthermore, because of the detriment to the public good that occurs whenever a member of a local agency exercises his discretion under a cloud of conflicting personal interest, the law does not allow the official's disqualification to be waived. *McVoy v. Board of Adjustment of Montclair*, 213 *N.J.Super.* 109, 114–16, 516 *A.*2d 634 (App.Div.1986).

In addition, we have held that where a municipal resolution must be set aside because it is infected with the taint of self-interest of the officials who voted for it, those officials may also be prosecuted for official misconduct. *State v. Furey*, 128 *N.J.Super.* 12, 20–21, 318 *A.*2d 783 (App.Div.), *certif. denied*, 65 *N.J.* 578, 325 *A.*2d 711 (1974). That is, a public official is guilty of misconduct in office when he has an undisclosed interest in a venture which comes before the body of which he is a member and when he acts in favor of that interest through the office he holds. *Cf. State v. Begyn, supra*, 34 *N.J.* 35, 52, 167 *A.*2d 161 (1961) (while ethical conflict of interest might warrant removal of the official, it does not constitute the crime of official misconduct).

The crime of official misconduct serves to insure that those who stand in a fiduciary relationship to the public will serve with the highest fidelity, will exercise their discretion reasonably,

and will display good faith, honesty, and integrity. These are the obligations which every public officer assumes as a matter of law upon entering office. *Driscoll v. Burlington–Bristol Bridge Co.*, 8 *N.J.* 433, 474–76, 86 *A.2d* 201, *cert. denied,* 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952); *State v. Deegan,* 126 *N.J.Super.* 475, 491, 315 *A.2d* 686 (App.Div.), *certif. denied,* 65 *N.J.* 283, 321 *A.2d* 244 (1974).

Recently, our Supreme Court held that where the duties of a police officer were involved, the official misconduct statute merely requires that the act of misconduct "relate to the public office." *State v. Hinds,* 143 *N.J.* 540, 674 *A.2d* 161 (1996) (shoplifting by a police officer, facilitated by a store employee, constituted official misconduct because the officer was required by law to apprehend not only himself but also the employee). Nevertheless, the Court recognized that not every offense committed by a public official should subject that official to an additional prosecution for official misconduct. *Id.* at 549, 674 *A.2d* 161. Moreover, the public servant must know of the existence of the duty which he is accused of violating. The duty to act must be so clear that the public servant is on notice as to the standards he must meet. *Id.* at 545–46, 674 *A.2d* 161 (citing Cannel, *supra,* comment on *N.J.S.A.* 2C:30–2).

Here, the State contends that the indictment charged that Rabbi Schenkolewski, a public official, accepted a benefit in exchange for engaging in conduct that was clearly a breach of the ethical obligations and duties of a public official. The State urges that the Code of Ethics, *N.J.S.A.* 40A:9–22.5, effective May 21, 1991, is evidence of the known duties and obligations of local officials. Further, the State argues that public officials have an inherent duty to "perform their duties free from any personal or pecuniary interests that might affect their judgment." *Barrett v. Union Township Comm.,* 230 *N.J.Super.* 195, 200, 553 *A.2d* 62 (App.Div.1989).

Defendants maintain that no official duty was violated. They contend that there was an insufficient relationship to defendant

Schenkolewski's official position and the alleged misconduct. The trial judge agreed with defendants' arguments and found that the indictment lacked the elements of an act relating to defendant Schenkolewski's office.

In our view, the trial judge gave too strict a reading to the evidence in the matter before the grand jury. Our review of that evidence in the light most favorable to the prosecution reveals sufficient evidence to allow a jury to find that the State established the elements of official misconduct. Here defendant Schenkolewski served in an official capacity on the Zoning Board and was a liaison to the Planning Board. While serving in those capacities he could be deemed to have accepted for himself or another $500,000 from a partnership seeking governmental approvals from both bodies. It was not enough for Rabbi Schenkolewski to merely leave the meeting during the vote or fail to attend if he influenced the vote.

Further, as the State contends the evidence supports an inference that the Rabbi imposed the steam prohibition on the Zoning Board resolution approving the application of a tomato grower at the request of Committeeman Franklin to place another obstacle in the path of the cogeneration plant. The March 25, 1991 letter from Halleran approximately one week before a scheduled Zoning Board hearing on the removal of the steam condition, stating that the "date of April 1st may be appropriate to adjourn based upon the Rabbi's involvement in connection with our settlement proposal" is evidence of the Rabbi's continued involvement. On July 16, 1991, a $50,000 payment was deposited in a new account opened by the Rabbi to receive this money from Buckley. On that same day, the Planning Board approved the site plan extension for the cogeneration plant. Later Halleran requested a hearing in September before the Zoning Board seeking to remove the steam condition. In a September 6, 1991 letter from Halleran to Buckley, Halleran explained that prior to the Zoning Board hearing defendant Penzer contacted Halleran and urged him not to press for removal of the condition at that meeting. Halleran wrote, "[i]n

addition, for whatever reason, Rabbi Schenkolewski was not present to chair the meeting. Accordingly, ... we carried the balance of the application dealing with the elimination of the fueling [condition]."

This evidence is sufficient to support a reasonable inference that Rabbi Schenkolewski continued to be involved with the Zoning Board matter while he agreed to receive $500,000 upon approval of the project. Additionally, the State presented evidence that the Rabbi traveled to Syracuse and met with the representative of the hydroponics facility just prior to the removal of the steam condition by the Zoning Board on January 2, 1992. We are convinced that a reasonable grand jury could conclude that the Rabbi's involvement in the matter before the Zoning Board was continuing while he facilitated the necessary approvals in exchange for substantial sums of money. If believed, this evidence was sufficient to show that Rabbi Schenkolewski was a public official, who willfully and intentionally engaged in the wrongful conduct alleged by the State while acting under the color of his office. Consequently, it was error to dismiss the official misconduct charge.

## IV

The State further contends that the trial judge erred in finding that in addition to the failure to establish the crimes charged, the indictment should be dismissed as a result of certain prosecutorial errors and improprieties in presenting the matter to the grand jury. We need not address each of the State's arguments separately.

It is first necessary to recount briefly what happened at the grand jury proceedings. On January 12, 1994, the first day the grand jury met, Robert Peck, an investigator from the Ocean County Prosecutor's Office, testified that the proposed cogeneration facility would be selling its power to JCP & L. The following then occurred:

[GRAND JUROR]: Excuse me, is JCP & L directly involved in this?

[PROSECUTOR]: They are not likely to be a target, if that's what you mean.

[GRAND JUROR]: Well, they sign my paychecks every week.

The prosecutor did not respond to this comment but continued with his direct examination of the witness. The record shows no further colloquy with this juror.

The next incident occurred on February 2, 1994, the third grand jury session. On that date, the clerk of the jury told the prosecutor that one of the jurors had indicated a possible conflict.

[PROSECUTOR]: About J.C.P. and L.?

[GRAND JUROR]: No, the Rabbi he is on the Board of the bank that I'm on and George Buckwald [2] who is going to be here and we are going to be hearing testimony from is on the Board of Directors. I don't know if that will cause a conflict of interest. If you're talking about indicting the Rabbi would that cause a problem?

[PROSECUTOR]: Well, if it comes to a situation where you feel that you have to recuse yourself because of something like that is possible but rather than make a preliminary judgment on it . . . you are entitled to hear this along with the other members of the Grand Jury. I think we can wait crossing that bridge.

■ We are satisfied that the trial judge properly concluded that *State v. Murphy*, 110 *N.J.* 20, 538 *A.*2d 1235 (1988), mandated dismissal. *See also R.* 3:6–3. The judge found that the procedures followed here were flawed and that the two grand jurors in question were potentially biased: one worked for JCP & L and the other sat on a bank board with Rabbi Schenkolewski. The judge noted that the grand jury record was rife with references to JCP & L, and that these references constituted evidence that could affect the impartial deliberations of a grand juror. The prosecutor did not investigate or determine what position the JCP & L employee held with the company and failed to question whether the bank board juror had a close relationship with the Rabbi or Buckwald, or even prior dealings with either of them.

---

2 George Buckwald was a former committeeman and Mayor of Lakewood. He had been on the Township Committee when that body had originally voted not to transfer the land to the developers. However, Buckwald had voted to transfer because he had been in favor of the project from the beginning. He later resigned the Committee and was appointed executive director of the Lakewood Industrial Commission, the entity which had contracted with the developers to sell them the land.

See *State v. Brown*, 289 *N.J.Super.* 285, 673 *A.*2d 834 (App.Div. 1996). Since both the mandate of *Murphy* and the requirement of *R.* 3:6–3 were violated, the judge properly dismissed the indictment. Further, the judge noted that it did not matter that one juror had been excused and the other one disqualified from voting, because the potential for tainting the other jurors was self-evident. We agree.

Consequently, we affirm the dismissal of the indictment based on the prosecutor's failure to ensure the impartiality of the grand jurors.

### V

In summary, we conclude that the State presented sufficient evidence to support an indictment against defendants for conspiracy, bribery and official misconduct. We are satisfied, however, that this indictment was properly dismissed because the prosecutor failed to investigate the grand jurors' potential bias and to refer the matter to the Assignment Judge.

Affirmed.