**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1449-12T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

IVONNE SAAVEDRA,

    Defendant-Appellant.

_____

<table>
<tr><td><b>APPROVED FOR PUBLICATION</b><br><br><b>December 24, 2013</b><br><br><b>APPELLATE DIVISION</b></td></tr>
</table>

        Argued September 11, 2013 — Decided December 24, 2013

        Before Judges Fuentes, Simonelli and
        Fasciale.

        On appeal from the Superior Court of New
        Jersey, Law Division, Hudson County,
        Indictment No. 12-05-0849.

        Mario M. Blanch argued the cause for
        appellant.

        Leo Hernandez, Special Deputy Attorney
        General/Acting Assistant Prosecutor,
        argued the cause for respondent (Gaetano
        T. Gregory, Acting Hudson County
        Prosecutor, attorney; Mr. Hernandez, on
        the brief).

    The opinion of the court was delivered by

FASCIALE, J.A.D.

    By leave granted, defendant Ivonne Saavedra appeals from an

order denying her motion to dismiss an indictment returned by a

Hudson County grand jury charging her with second-degree

official misconduct, N.J.S.A. 2C:30-2a, and third-degree theft of movable property (public documents), N.J.S.A. 2C:20-3 and N.J.S.A. 2C:20-2b(2)(g). Because defendant attacks the facial validity of the charges against her, we will review the evidence presented by the State to determine whether there was probable cause for the grand jury to find that these crimes were committed and that defendant committed them. In re State ex rel. A.D., 212 N.J. 200, 218 (2012). We affirm.

## I.

Defendant took highly confidential original documents owned by her employer, contending that she did so to support her employment discrimination lawsuit. Relying on Quinlan v. Curtiss-Wright Corp., 204 N.J. 239 (2010), defendant argues that her acts are not criminally sanctionable. She contends that because Quinlan purportedly establishes an absolute right for employees with employment discrimination lawsuits to take potentially incriminating documents from their employers, the judge erred by denying her motion. We disagree. Quinlan did not establish such a bright-line rule as defendant suggests. Quinlan, a civil employment discrimination case, enunciated a seven-part totality-of-the-circumstances test (the "Quinlan analysis") to determine whether a private employer can terminate its employee for the unauthorized taking of its documents.

We hold, under the facts of this case, that a criminal court judge is not required to perform a Quinlan analysis to decide a motion to dismiss an indictment charging a defendant with official misconduct predicated on an employment-related theft of public documents. Instead, the judge should apply well-settled standards regarding whether to grant such motions. That is, to survive a motion to dismiss an indictment, the State need not produce evidence adequate to sustain a conviction; but rather, the State must introduce sufficient evidence before the grand jury to establish a prima facie case that defendant has committed a crime. State v. Hogan, 144 N.J. 216, 236 (1996). Because the State produced such evidence here, the judge properly concluded that the indictment was not manifestly deficient or palpably defective. Id. at 228-29, 236.

Whether a petit jury ultimately finds defendant guilty of official misconduct and theft will depend on the State's ability to prove beyond a reasonable doubt each and every element of these crimes. If there is sufficient evidence to support defendant's contention that she honestly believed she had a right to the documents in question, she can raise such a claim as an affirmative defense at trial. The State then would have the burden of proving, beyond a reasonable doubt, that defendant did not act pursuant to a claim of right.

II.

The North Bergen Board of Education (the "Board") employed defendant for several years as a clerk.[1]  She started working in the Board's payroll department and remained there for ten years. She was thereafter assigned to the Board's Special Services Department and became a clerk for a child study team.[2] Defendant's son also worked as a part-time employee for the Board.

In November 2009, one year before the Court decided Quinlan, defendant and her son filed a complaint against the Board, her supervisor, an office manager, and a North Bergen

---

[1] Although not entirely clear from the record, we infer that defendant's position of "clerk" appears to fall within the scope of clerical or secretarial tenured positions, described in N.J.S.A. 18A:17-2b as "[a]ny person holding any secretarial or clerical position or employment under a board of education of any school district or under any officer thereof."  N.J.S.A. 18A:17-2c protects individuals who have acquired tenure in such a position "during good behavior and efficiency" from dismissal, suspension, or reduction in compensation, "except for neglect, misbehavior or other offense . . . ."

[2] The child study team in a school is comprised of specified professionals who can evaluate the particular needs of children with learning disabilities.  "Each board of education [is required to] provide for basic child study team services.  The basic child study team shall consist of a school psychologist, a learning disability teacher consultant and a school social worker, and for the purposes of evaluation and classification shall include pertinent information from certified school personnel making the referral."  N.J.S.A. 18A:46-5.1.

A-1449-12T4

Township Commissioner.[3]  Defendant alleged that she was a victim of gender, ethnic, and sex discrimination.  The complaint also alleged that the Board terminated defendant's son because defendant voiced what she understood to be problems in her workplace regarding alleged pay irregularities, reimbursing employees improperly for "unused" vacation time that they had actually used, wrongful denial of employee unpaid family leave, violations of child study team regulations, and "unsafe conditions."[4]  They alleged, among other causes of action, employment discrimination, hostile work environment, and retaliatory discharge, in violation of the New Jersey Law Against Discrimination (the "LAD"), N.J.S.A. 10:5-1 to -49, and they sought punitive damages.[5]

---

[3] Defendant improperly identified in her civil complaint the North Bergen Township Commissioner as a "councilman."

[4] Defendant alleged in her civil complaint against the Board that the Board did not terminate her from employment because she is tenured.

[5] The complaint contains the following counts: a violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14 (Count One); a violation of public policy (Count Two); a violation of Section 1983 of the Civil Rights Act, 42 U.S.C.A. § 1983 (Count Three); a violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (Count Four); civil rights conspiracy (Count Five); violations of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201-209 (Count Six); a violation of the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a to -56a38 (Count Seven); hostile work environment, in violation of the LAD (Count Eight); adverse employment action, in violation of the LAD (Count Nine);
(continued)

Defendant's counsel in the civil case learned eventually from defendant that defendant possessed hundreds of documents owned by the Board. Criminal defense counsel on this appeal indicated in his merits brief that defendant's civil lawyer "chose to use the documents during the discovery phase of [defendant's] pending lawsuit against [the Board]." (Emphasis added). Defendant's civil attorney turned over those documents to counsel defending the Board in the employment discrimination suit. The Board's attorney notified the Board's general counsel. The general counsel brought the matter to the attention of the Hudson County Prosecutor, who determined that the matter should be presented to a grand jury.

The grand jury convened to hear evidence in this case in April 2012, more than two and one-half years after defendant had filed her civil complaint. The State called the Board's general counsel to testify as its only witness before the grand jury. He testified that defendant had sued the Board and that "there [was] a [civil] lawsuit outstanding." The general counsel testified that defendant had taken from the Board 367 documents,

---

(continued)
a violation of the New Jersey Family Leave Act, N.J.S.A. 34:11B-1 to -16, and the Family Medical Leave Act, 29 U.S.C.A. § 2601 to -2654 (Count Ten); intentional infliction of emotional distress (Count Eleven); respondeat superior (Count Twelve); and punitive damages (Count Thirteen).

including at least sixty-nine original documents. He informed the Board's defense counsel that "the information [contained] in those documents was highly confidential, very sensitive, and [that the Board] needed to act on [defendant's decision to resort to self-help] immediately." He then described five of the documents, focusing on the confidential nature of each one.

The first document is a bank statement that a parent provided to the Board. The Board used this bank statement to verify whether that parent and the parent's child met the school district's residency requirements. This document reveals the parent's name and address, a bank account number, an account balance, a description of the type of account (either a checking or savings account), and a statement date.

The second document is an appointment schedule of a psychiatrist who treated students with special needs in the district. This document identifies the names of various students whom the psychiatrist planned to treat, and it contains a note that one named student "is on medication and needs [more] medication." Releasing this document to the public would jeopardize the Board's ability to ensure that its students with mental health issues receive psychiatric treatment and would violate the students' privacy rights.

The third document, which general counsel believed to be an original, is entitled "Consent for Release of Information to Access Medicaid Reimbursement for Health-Related Support Services." This document discloses the name and private contact information of a parent who agreed to participate in a Medicaid-reimbursement program, and it identifies the student's name, date of birth, enrollment date, school, and grade level. The Board uses this type of document to seek reimbursement from Medicaid for medical and other services that students with special needs receive. The Board faces liability exposure if the State or Federal Government performs an audit and this document is missing.

The fourth document, also believed to be an original, is a signed letter from a parent whose child is receiving confidential services for the child's special needs. It contains the family's private information, such as names of the parents and student, the name of the student's school, and contact telephone numbers.

The fifth document is an original letter from a different parent to the Director of Special Services regarding an emotional problem involving that parent's child. In the letter, the parent indicated that her son "came off the bus soaked in

8

urine, very nervous, and his eyes were twitching." The document reveals the identity of the student.

General counsel testified that the documents in defendant's possession belonged to the Board. He explained that Board "employees are trained and informed[,] via internal policies[,] guidelines[,] and regulations[,] that these documents are highly confidential and are not to be disclosed or tampered with in any way." He stated that these documents are not to be "disclosed [or] taken" by Board employees.

In May 2012, the grand jury indicted defendant and charged her with committing the crimes of official misconduct and theft. Defendant then moved to dismiss the indictment. During oral argument on that motion, the judge focused on whether the State presented sufficient evidence to establish a prima facie case that defendant committed these offenses.

Defense counsel contended that defendant took the documents for a lawful use, that the State failed to present exculpatory evidence to the grand jury, and that the State was punishing defendant for exercising improper judgment on the job. Defense counsel argued that "Quinlan says it's legal to take confidential documents," and that preventing defendant from

taking the confidential documents would have a chilling effect on future LAD cases.[6]

The State maintained that it presented to the grand jury sufficient evidence to show that defendant committed these crimes. The assistant prosecutor argued that defendant's reliance on Quinlan was misplaced. He stated that Quinlan, which he emphasized was decided in the context of a civil case rather than on a motion to dismiss an indictment, did not create a bright-line rule permitting a public servant such as defendant to take highly confidential documents that did not belong to her. The State asserted that the indictment was not manifestly deficient or palpably defective and there existed no exculpatory evidence that squarely refuted an element of the offenses.

In October 2012, the judge issued a thorough written decision agreeing with the State's arguments, and denied the motion. The judge recognized that on a motion to dismiss the indictment, the State need not produce evidence adequate to sustain a conviction, but rather, the State's evidence must be sufficient to establish a prima facie showing that a crime has

---

[6] Defense counsel stated in his merits brief that defendant dismissed her lawsuit against the Board. The parties did not produce a stipulation of dismissal, and the record is unclear regarding when or why she dismissed her claims. It is also unclear whether the son continued with his claims against the defendants in the civil case.

been committed. She acknowledged that defendant bears a "'heavy burden' of demonstrating that the 'evidence is clearly lacking to support the charge[s].'" The judge then concluded that defendant did not meet her burden.

Although the judge rejected the applicability of Quinlan, she performed the Quinlan analysis out of an abundance of caution. The judge concluded that the Quinlan factors weighed heavily in favor of the Board.[7] The judge then held that "an employee's removal of documents from his or her employer for use in a []LAD suit, is not per se lawful." This appeal followed.

On appeal, defendant raises the following points:

> POINT I
> THE INDICTMENT FOR "OFFICIAL MISCONDUCT"
> SHOULD BE DISMISSED AS THE STATE HAS FAILED
> TO PRESENT SUFFICIENT EVIDENCE TO THE GRAND
> JURY TO SUSTAIN A PRIMA FACIE CASE.
>
> > A. [Defendant] is not a Public
> > Servant for Purposes of Official
> > Misconduct.
> >
> > B. The State has Failed to Show
> > any "Purpose" to "Obtain a
> > Benefit."
> >
> > C. The State has Failed to Show
> > Proof that [defendant] acted with
> > Purpose to Injure or Deprive.
> >
> > D. The Indictment Must Be
> > Dismissed As There is No Evidence

---

[7] It appears that a Quinlan analysis was not performed by a judge in the civil case because defendant dismissed her complaint.

to Show that [defendant] Knew that
Her Actions Were Unauthorized.

POINT II
THE INDICTMENT SHOULD BE DISMISSED BECAUSE
THE LEGISLATIVE INTENT IS NOT TO PUNISH
EMPLOYEES FOR ALLEGEDLY IMPROPER JUDGMENT ON
THE JOB.

POINT III
[DEFENDANT] CANNOT BE FOUND GUILTY OF THEFT
AS SHE TOOK THE DOCUMENTS FOR A LAWFUL USE.

POINT IV
THE INDICTMENT MUST BE DISMISSED AS THE
PROSECUTOR FAILED TO PRESENT EXCULPATORY
EVIDENCE RELATING TO THE UNDERLYING SUIT
[THAT DEFENDANT] HAD PENDING WITH THE BOARD
OF EDUCATION OF NORTH BERGEN.

POINT V
ALLOWING THE PROSECUTION OF [DEFENDANT] TO
CONTINUE WILL CREATE A CHILLING EFFECT TO
POTENTIAL PLAINTIFFS IN LAD CLAIMS.

POINT VI
THE CRIMINAL PROSECUTION OF [DEFENDANT] IS
UNJUST BECAUSE IT HAS ALLOWED THE ATTORNEYS
FOR THE . . . BOARD OF EDUCATION TO VIOLATE
THE CANONS OF ATTORNEY ETHICS.

III.

We begin by addressing whether the judge abused her discretion by denying defendant's motion to dismiss the indictment. We will not disturb the denial of such a motion "unless [the judge's discretionary authority] has been clearly abused." State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994) (quoting State v. Weleck, 10 N.J. 355, 364 (1952)),

A-1449-12T4

certif. denied, 140 N.J. 277 (1995). Against this standard, we conclude that there was no abuse of discretion.

A judge should not dismiss an indictment except on the clearest and plainest ground, where it is "manifestly deficient or palpably defective." Hogan, supra, 144 N.J. at 228-29. When reviewing such motions, the court must construe the facts in the light most favorable to the State. State v. Fleischman, 383 N.J. Super. 396, 398 (App. Div. 2006), aff'd, 189 N.J. 539 (2007). "As long as an indictment alleges all of the essential facts of the crime, the charge is deemed sufficiently stated." State v. Schenkolewski, 301 N.J. Super. 115, 137 (App. Div.), certif. denied, 151 N.J. 77 (1997). We have stated that "the quantum of this evidence . . . need not be great." Ibid.

A.

The State produced sufficient evidence to establish a prima facie case of theft of movable property. N.J.S.A. 2C:20-3a provides that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." Here, theft is a third-degree offense pursuant to N.J.S.A. 2C:20-2b(2)(g). At this stage in the case, we must look at the facts presented to the grand jury in the light most favorable to the State. From this perspective, the State introduced evidence that defendant

violated the Board's "internal policies[,] guidelines[,] and regulations[,]" by taking its highly confidential original documents, which suggests that defendant did so with the purpose to deprive the Board. The State also introduced evidence suggesting that by taking these documents, defendant intended to disrupt the psychiatric treatment of students with special needs, and also exposed the Board to liability in the event of a state or federal Medicaid audit.

Defendant's counsel contends, like he did before the criminal judge, that the State is unable to show that defendant "unlawfully" took the documents because "Quinlan says it's legal to take confidential documents." We disagree with defendant's reading of Quinlan. We also emphasize that the grand jury is an accusatorial rather than an adjudicative body; grand jurors do not determine guilt or innocence. Hogan, supra, 144 N.J. at 227. A grand jury is simply "asked to determine whether 'a basis exists for subjecting the accused to a trial.'" Ibid. (quoting Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 487 (1971), cert. denied, 405 U.S. 1065, 92 S. Ct. 1500, 31 L. Ed. 2d 796 (1972)). Here, the record demonstrates that the grand jury correctly performed its limited role.

We agree with the trial judge that Quinlan is factually distinguishable. The plaintiff in Quinlan, a private individual

rather than a public employee like defendant, contended that her employer discriminated against her when it promoted a less qualified man to the position of supervisor. Quinlan, supra, 204 N.J. at 244. During discovery in her LAD case, her employer, a private company, learned that Quinlan had taken confidential documents. Ibid. Thereafter, her employer terminated her. Ibid.

The Supreme Court framed the issue in Quinlan as "creat[ing] the appropriate framework against which [civil] courts may weigh and consider whether, and to what extent, an employee who finds, copies, and discloses an employer's otherwise confidential documents in the context of prosecuting a discrimination case was engaged in conduct protected by the LAD." Id. at 245. In undertaking that challenge, the Court balanced the rights of "individual plaintiffs seeking to vindicate their rights and employers legitimately expecting that they will not be required to tolerate acts amounting to self-help or thievery." Id. at 245-46. The Court created a seven-part analysis for use in a civil case, "a flexible, totality of the circumstances approach."

Civil judges apply this seven-part analysis by considering, in part, such things as whether: "discovery of the document was due to the employee's intentional acts outside . . . her

15                                                      A-1449-12T4

ordinary duties"; the document "includes personal or confidential information such as Social Security numbers or medical information about other people"; there is a "company policy on privacy or confidentiality that the employee's disclosure has violated"; use of the document "is unduly disruptive to the employer's ordinary business"; the employee can obtain the document by "describing it or identifying its existence to counsel so that it might be requested in discovery"; and whether there is "a likelihood that the employer would not maintain it, or would have discarded it in the ordinary course of business, that it would have been destroyed, or that its authenticity would be called into doubt." Id. at 269-71. The Court applied this balancing test and stated that

> [a]pplying [the Quinlan analysis] to the documents before the court, we find ourselves in agreement with the distinction that the trial court drew. The trial court correctly told the jury that plaintiff's act of taking the documents, . . . was not protected [activity] and that the employer was free to terminate her for doing so.
>
> [Id. at 273.]

We reject defendant's argument that the holding in Quinlan essentially prevents the State from introducing evidence before the grand jury that demonstrates a prima facie showing that defendant "unlawfully t[ook], or exercise[d] unlawful control over" the documents. Quinlan did not establish a bright-line

16                                                    A-1449-12T4

rule that automatically entitled defendant to take the Board's highly confidential original documents. In fact, the Court in Quinlan made clear that even with the availability of its multifaceted analysis, employees

> run the significant risk that the conduct in which they engage will not be found by a court to fall within the protection [the Quinlan analysis] creates. The risk of self-help is high and the risk that a [petit civil] jury will reject a plaintiff's argument that he or she was fired for using the document, rather than for finding it and taking it in the first place, will serve as an important limitation upon any realization of the fears that the employers have expressed to the Court.[8]
>
> [Id. at 272 (emphasis added).]

## B.

The State produced sufficient evidence to establish a prima facie case of official misconduct. Here, the official misconduct charge is a second-degree offense pursuant to N.J.S.A. 2C:30-2, because the State presented evidence to the grand jury that defendant derived a non-pecuniary benefit. See State v. Phelps, 187 N.J. Super. 364, 375 (App. Div. 1983)

---

[8] We emphasize that the Quinlan majority gave this warning when it balanced the interests of plaintiffs seeking to vindicate their rights against employers' legitimate expectation "that they will not be required to tolerate acts amounting to self-help or thievery." Id. at 245-46. Thus, the Court gave sufficient notice to employees that by resorting to self-help, their conduct may also be illegal.

(stating that "a person may be convicted of the second[-]degree offense of official misconduct even though no pecuniary benefit is involved"), aff'd, 96 N.J. 500 (1984). Pursuant to N.J.S.A. 2C:30-2b, official misconduct is a third-degree offense "[i]f the benefit obtained or sought to be obtained . . . is of a value of [$200] or less." The Court stated that

> the Legislature . . . intended to treat more moderately offenses which, by an objective standard, could be measured to be relatively less consequential in nature than would otherwise be the case. It carved out a type of official misconduct for lenient treatment. But the Legislature did not in the downgrading provision deal with a benefit not subject to pecuniary measurement.
>
> [Phelps, supra, 187 N.J. Super. at 375.]

Pursuant to N.J.S.A. 2C:30-2a,

> [a] public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner.

Thus, pursuant to this section of the statute, official misconduct has three elements: (1) a defendant must be a "public servant," (2) "who committed 'an act relating to his office,' which constituted 'an unauthorized exercise of his official

functions,' knowing that it was unauthorized or committed in an unauthorized manner," and (3) had a purpose "to obtain a benefit for himself or another" or "to injure or deprive another of a benefit." State v. Quezada, 402 N.J. Super. 277, 283 (App. Div. 2008).

The State made a prima facie showing that defendant is a "public servant," defined by N.J.S.A. 2C:27-1g as any "employee of government, . . . [who performs] a governmental function[.]" "The term 'public servant' is 'defined broadly for purposes of [official] misconduct . . . for . . . offenses against public administration.'" State v. Perez, 185 N.J. 204, 206 (2005). As long as defendant performed a "governmental function," she is considered to be a public servant under this section of the statute. See Quezada, supra, 402 N.J. Super. at 283 (focusing on the actor's performance of a governmental function); see also Perez, supra, 185 N.J. at 207 (stating that a clerk of the North Bergen Department of Motor Vehicle's office is a "public servant" because she performed governmental functions). The Board, which is itself a public entity under N.J.S.A. 59:1-3, is unquestionably a "governmental vehicle through which [the constitutional obligation to provide a] mandatory education takes place." Tonelli v. Bd. of Educ., 185 N.J. 438, 450 (2005). Here, defendant performed a governmental function by

serving public school students with special needs and their families as a clerk for a child study team in the Board's Special Services Department.

The State also made a prima facie showing that defendant committed "an act relating to [her] office" which constituted "an unauthorized exercise of [her] official functions," knowing that it was unauthorized or committed in an unauthorized manner. General counsel testified that the Board trained and informed its employees, "via internal policies[,] guidelines[,] and regulations[,] that the documents defendant took are highly confidential and are not to be tampered with in any way." He asserted that these documents are not to be "disclosed [or] taken" by Board employees. Giving the State the benefit of all reasonable inferences, as we must on a motion to dismiss an indictment, the State showed that it notified defendant in writing that she was unauthorized to remove the five documents presented to the grand jury.

Finally, the State produced sufficient evidence to establish a prima facie showing that defendant had a purpose "to obtain a benefit for [herself] or another" or "to injure or deprive another of a benefit." A "benefit" is a "gain or advantage or anything so regarded by the beneficiary." <u>Phelps</u>, <u>supra</u>, 187 <u>N.J. Super.</u> at 375; <u>see also</u> <u>N.J.S.A.</u> 2C:27-1a. The

A-1449-12T4

statute does not require a malicious intent, but rather an "affirmative act." State v. Kueny, 411 N.J. Super. 392, 404 (App. Div. 2010). General counsel informed the grand jury that defendant sued the Board and that defendant's civil case was pending. Looking at the facts in the light most favorable to the State, Fleischman, supra, 383 N.J. Super. at 398, defendant acted with the purpose to derive a benefit by taking the documents to support her civil lawsuit, or to "injure or deprive" the Board of its ability to defend the allegations in the civil suit. Moreover, the removal of copies and original Board documents exposed the Board to potential liability by making the Board unprepared for an audit related to Medicaid reimbursement, and by possibly disrupting psychiatric treatment for students with special needs.

IV.

Defendant argues that "if she committed any wrongdoing," she made an "honest error." Defendant asserts that because she may have exercised "improper judgment on the job," by taking documents that may constitute an "unauthorized" act, the judge erred by denying her motion to dismiss the indictment. Defendant equated her decision to remove the Board's highly confidential financial and medical records with that of a janitor erring by taking home a mop. The premise of her

argument is that the Legislature did not intend to include her conduct as activity that constitutes official misconduct.

"The crime of official misconduct serves to insure that those who stand in a fiduciary relationship to the public [such as defendant] will serve with the highest fidelity, will exercise their discretion reasonably, and will display good faith, honesty, and integrity." Schenkolewski, supra, 301 N.J. Super. at 145-46. As we have previously stated, "[a]s long as an indictment alleges all of the essential facts of the crime, the charge is deemed sufficiently stated." Id. at 137. Defendant stood in "a fiduciary relationship" to the public and therefore was expected to serve with the "highest fidelity." Thus, we reject defendant's contention that the Legislature did not intend to include within the official misconduct statute the activity of taking highly confidential documents while performing a governmental function as a public servant.

Defendant's "honest error" argument is not insignificant, however, because it amounts essentially to a claim of right defense. The time to assert such a defense, though, is at trial, rather than as a basis to dismiss the indictment. Pursuant to N.J.S.A. 2C:20-2c, a defendant may assert the affirmative defense that she "(1) [w]as unaware that the property . . . was that of another; [or] (2) [a]cted under an

honest claim of right to the property . . . that [s]he had a right to acquire or dispose of it as [s]he did."  The jury charge for this defense states in part that

> [i]n addition to . . . her general denial of guilt, the defendant contends that . . . she is not guilty of [theft and official misconduct] because . . . she was acting pursuant to a claim of right to the property.
>
> Our law provides that it is a defense to prosecution[9] for [theft] that the defendant acted under an honest claim of right to the property . . . or that . . . she had a right to acquire or dispose of the property as . . . she did.  An honest claim is one that is genuinely, though not necessarily correctly, believed by the defendant.
>
> This defense, you should note, is not limited to situations in which a defendant believed . . . she owned the property.[]  Rather, it includes those situations in which the defendant honestly, although not necessarily correctly, believed that . . . she had either the right or the authorization to receive, take, acquire, or dispose of the property.
>
> As I have mentioned to you, since this is a criminal case the burden of proof is on the State.  The defendant is,

_____

[9] Judges are reminded to omit the phrase "affirmative defense," to avoid any suggestion that the defendant bears the burden of proof on a claim of right defense.  Nevertheless, the defense is an affirmative one, and the charge should only be given when there is some evidence that would support it.  N.J.S.A. 2C:1-13b(1); see State v. Ippolito, 287 N.J. Super. 375 (App. Div.) (finding an evidential basis for giving this charge), certif. denied, 144 N.J. 585 (1996).

therefore, not required to prove that . . . she acted pursuant to a claim of right; rather the burden is on the State to prove that the defendant did not act pursuant to a claim of right. . . .

. . . .

[I]f the State has failed to prove beyond a reasonable doubt . . . that the defendant did not honestly believe . . . she had a right to the property or was authorized to receive, take, acquire, or dispose of the property, then you must find the defendant not guilty.

At oral argument before us, counsel addressed questions regarding whether the judge should have conducted what was described as a "Quinlan hearing" to resolve whether to grant defendant's motion to dismiss the indictment.[10]  Here, the judge performed the Quinlan analysis out of an abundance of caution. We are satisfied, however, that Quinlan does not apply directly to the facts presented here because the Supreme Court did not intend its holding in that civil case to act as a means of mounting a facial challenge to the indictment in this criminal case.  As we have discussed at length infra, the standards for

---

[10] We note that in general, prosecutors act independently from the "civil system."  See Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 63-64 (App. Div. 2002) (indicating in the context of a Title 9 abuse and neglect case that "the criminal justice system acts separately . . . [from] the civil system") (quoting State v. P.Z., 152 N.J. 86, 100 (1997)) (internal quotation marks omitted).

assessing the sufficiency of an indictment are well-settled. Hogan, supra, 144 N.J. at 228-29. There is nothing in Quinlan that signals any deviation from Hogan.

V.

Defendant contends that the indictment must be dismissed because the State failed to present to the grand jury exculpatory evidence "relating to" her LAD lawsuit against the Board. Defense counsel argues that defendant's taking of the documents to support her civil lawsuit against the Board "is legal . . . under Quinlan," and that the assistant prosecutor failed to present defendant's purported reason for taking the documents. Defendant argues, therefore, that this evidence would have negated her guilt.

A prosecutor's duty to present exculpatory evidence to a grand jury arises "only if the evidence satisfies two requirements: it must directly negate guilt and must also be clearly exculpatory." Hogan, supra, 144 N.J. at 237. Limiting the prosecutor's duty to presenting "evidence that directly negates . . . guilt" recognizes that "the sole issue before the grand jury is whether the State has made out a prima facie case of the accused's guilt." Ibid. Exculpatory evidence must "squarely refute[] an element of the crime." Ibid. The Court stated that

> [a]scertaining the exculpatory value of evidence at such an early stage of the proceedings can be difficult, . . . and courts should act with substantial caution before concluding that a prosecutor's decision in that regard was erroneous. We emphasize that only in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand jury constitute grounds for challenging an indictment.
>
> [Id. at 238-39 (citation omitted).]

Here, presenting evidence to the grand jury that defendant took the documents to pursue her civil lawsuit against the Board is not "clearly exculpatory." Even if Quinlan were directly on point, which it is not, "what the employee did with the document" is only one factor to consider pursuant to the Quinlan analysis. Undertaking the Quinlan analysis is "a difficult . . . task," Quinlan, supra, 204 N.J. at 271, and defendant's purported reason for taking the documents does not in and of itself constitute "clearly exculpatory" evidence.

There is also no credible evidence that the State deceived the grand jury during its presentment of this matter. See Hogan, supra, 144 N.J. at 236 (maintaining that "the grand jury cannot be denied access to evidence that is credible, material, and so clearly exculpatory as to induce a rational grand juror that the State has not made out a prima facie case against the accused"). General counsel informed the grand jury that

defendant's lawsuit against the Board was "outstanding." In fact, the grand jury at one point acknowledged that defendant had filed a suit against the Board and discussed among themselves the possibility that she took the documents to support her civil case.

> JUROR: Could I ask a question?
>
> MR. HERNANDEZ: Yes, ma'am.
>
> JUROR: What — I'm just curious. I thought I heard someone . . . say that she was going to sue the Board.
>
> MR. HERNANDEZ: Yes ma'am.
>
> JUROR: But how is that relevant . . . [?]
>
> (At this time, discussion occurs among Grand Jurors.)
>
> MR. HERNANDEZ: I believe you answered your own question.

The assistant prosecutor correctly refrained from speculating about defendant's purported reason for taking the documents. See ibid. (stating that "the prosecutor's sole obligation is to present a prima facie case that the accused has committed a crime"). In fact, the grand jury was not expected to resolve the credibility of a potential affirmative claim of right defense. Ibid. (indicating that "[c]redibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury"). Therefore, presenting

27                                                          A-1449-12T4

such evidence to the grand jury would not "squarely refute[] an element of the crime." Thus, the assistant prosecutor's unwillingness to speculate about defendant's purported reason for taking the documents did not interfere with the grand jury's decision-making.

VI.

Defendant maintains that allowing the State to criminalize her conduct through this prosecution will have a chilling effect on "potential plaintiffs in LAD claims." Defendant implies that prosecuting her for theft and official misconduct is against LAD's public policy of rooting out discrimination in the workplace. This implication amounts to a request that we hold it is against public policy to criminally prosecute employees for taking employer public documents.

At the outset, we note that whether to charge an individual suspected of criminal offenses is within the prosecutor's discretion. State v. DiFrisco, 118 N.J. 253, 265 (1990) (citing State v. Hermann, 80 N.J. 122, 127 (1979)). "[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." United States v. Nixon, 418 U.S. 683, 693, 94 S. Ct. 3090, 3100, 41 L. Ed. 2d 1039, 1055 (1974), superseded by statute, Fed. R. Evid. 104(a). "Beyond purely constitutional concerns, the judiciary generally defers to the

prosecuting attorney's discretion to charge or not to charge because enforcement decisions are the product of prosecutorial value judgments and expertise, and [because] courts lack standards by which to review these decisions." DiFrisco, supra, 118 N.J. at 265 (alteration in original) (citation and internal quotation marks omitted).

A.

As an intermediate appellate court, we do not have the power to determine, as a matter of public policy, what should be considered criminally culpable conduct. The framers of the New Jersey Constitution expressed that

> [t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
>
> [N.J. Const., art. III, ¶ 1.]

We discern no constitutional basis for the judiciary, much less this court, to intrude into the policy-making arena, an area traditionally reserved in our tripartite system of governance to the legislative and executive branches. As ably expressed by Chief Justice Vanderbilt sixty-three years ago, "no deviation from the . . . separation of powers [doctrine] will be tolerated which impairs the essential integrity of one of the [three]

branches of government."  Massett Bldg. Co. v. Bennett, 4 N.J. 53, 57 (1950).

Our commitment to this fundamental principle of governance has been reaffirmed and reflected in a variety of opinions issued by the Supreme Court as well as this court.  See Ross v. Transp. of N.J., 114 N.J. 132, 147 (1989) (refusing to carve out an exception to the statutory framework governing governmental limitations on tort liability); In re Closing of Jamesburg High Sch., 83 N.J. 540, 550 (1980) (holding that "important policy question[s]" should be left to the Legislature); Robinson v. Zorn, 430 N.J. Super. 312, 324-25 (App. Div.) (declining to create an exception to the policy governing governmental limitations on liability reflected in the Tort Claims Act, N.J.S.A. 59:1-1 to -12.3), certif. denied, 216 N.J. 8 (2013); In re Veto by Governor Christie, 429 N.J. Super. 277, 285-86 (App. Div. 2012) (refusing to "interven[e]" where the Legislature decided not to amend a 2001 statute that is related to and arguably inconsistent with comprehensive 2011 legislation), certif. denied, 214 N.J. 116 (2013); Brick v. Spivak, 95 N.J. Super. 401, 406 (App. Div.) (stating that "even if [the court] were to assume that there was an inadvertent omission" in the pertinent statute, the court "should not assume the function of the Legislature and rewrite the law to include therein something

which those charged with the legislative responsibility might have inserted if the matter had been called to their attention"), aff'd o.b., 49 N.J. 400 (1967). Following this well-settled precedent, we leave to the wisdom of the Legislature further consideration of whether to amend the theft and official misconduct statutes. State ex rel. B.P.C., 421 N.J. Super. 329, 347 (App. Div. 2011) ("Our role as a court is not to question the wisdom of legislative enactments, but to enforce them as long as they are not contrary to constitutional principles.").

## B.

Although defendant couches her argument broadly, contending that the State's prosecution will have a chilling effect on "potential plaintiffs in LAD claims," we consider this contention under the facts of this case. The Court in Quinlan considered the potential concern that an employer would destroy inculpatory documents or that otherwise relevant documents would become unobtainable if an employee did not resort to self-help measures to acquire confidential documents pertinent to the employee's LAD case. But here there is no evidence to suggest that the documents necessary to prove defendant's case against the Board would have been unobtainable by using the ordinary lawful means for securing discovery. Defendant does not argue

that she limited her self-help measures to a document or documents that were clearly inculpatory, so-called "smoking gun" evidence, to support her claims. Nor does defendant assert on appeal that she took the documents because "there was a likelihood that the [Board] would not maintain [them], or would have discarded [them] in the ordinary course of business, that [they] would have been destroyed, or that [their] authenticity would be called into doubt." Quinlan, supra, 204 N.J. at 271. Likewise, she does not contend that the documents would have been unavailable if she described them or identified their existence to the lawyer representing her in the civil case so that he might demand them in discovery.

Rather, defendant asserts in general that permitting the State's prosecution of her for official misconduct and theft would have a chilling effect on "potential plaintiffs in LAD claims." (Emphasis added). A plaintiff in a discrimination case such as this, however, has a variety of options by which to obtain information that is reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to (1) seeking, under certain circumstances, to preserve evidence through taking depositions and obtaining documents before filing a lawsuit (R. 4:11-1); (2) requesting documents pursuant to a protective order (R. 4:10-3); (3) taking depositions after the

commencement of the action (R. 4:14-1); (4) subpoenaing non-party witnesses for depositions (R. 4:14-7); (5) propounding interrogatories (R. 4:17); (6) serving document demands (R. 4:18); (7) propounding requests for admissions (R. 4:22-1); (8) obtaining orders to make discovery (R. 4:23); (9) seeking sanctions for failure to comply with court orders (R. 4:23-2); and (10) obtaining further sanctions for failure to make discovery (R. 4:23-5). There is no credible suggestion in this case that any of these lawful discovery avenues were unavailable to defendant.

There are also safeguards in place for employees like defendant who might believe that their employers will hide or destroy evidence. For example, a trial judge in a civil case may give an adverse inference charge to the jury, that the destroyed or concealed evidence would have been unfavorable to the employer. Under certain circumstances, a judge might issue sanctions against the employer or its counsel, and a party may bring a new cause of action based on the tort of fraudulent concealment. Robertet Flavors, Inc. v. Tri-Form Constr., Inc., 203 N.J. 252, 272-74 (2010); see also Bldg. Materials Corp. of America v. Allstate Ins., 424 N.J. Super. 448, 472 (App. Div.) (explaining various methods of addressing spoliation of evidence), certif. denied, 212 N.J. 198 (2012).

There are other safeguards in place to deter employers from pursuing criminal prosecution unfairly against employees. For instance, an aggrieved party may bring a claim for malicious prosecution if she can show that "(1) a criminal action was instituted by [the] defendant against [her]; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; and (4) the action was terminated favorably to the plaintiff." LoBiondo v. Schwartz, 199 N.J. 62, 90 (2009) (citing Lind v. Schmid, 67 N.J. 255, 262 (1975)). And, importantly, pursuant to R.P.C. 3.4(g), a lawyer runs the risk of ethics charges if that lawyer "present[s], participate[s] in presenting, or threaten[s] to present criminal charges to obtain an improper advantage in a civil matter." See Ruberton v. Gabage, 280 N.J. Super. 125, 134 (App. Div.) (indicating that "counsel walks a fine line in view of R.P.C. 3.4(g)"), certif. denied, 142 N.J. 451 (1995).

Moreover, defense counsel has not contended that defendant photocopied or took a document that "clearly indicates that the [Board] was engaged in illegal conduct." Quinlan, supra, 204 N.J. at 282. Although defense counsel states generally the policy concern that indicting employees who take such documents would undermine LAD's purpose of rooting out discrimination, counsel does not point to any "smoking gun" document in this

case. Nor does counsel explain why the documents were relevant to defendant's civil claims. Instead, counsel has noted that defendant's counsel in her civil case merely "chose" to use the documents. As Justice Albin stated in his dissent in Quinlan, in the circumstance of "classic whistle-blowing activity," "[a] test to balance the competing interests of an employee and employer and the public good, . . . may well be required." Ibid. Although an affirmative defense of a claim of right would also be available to an employee who took, for example, the "smoking gun," we need not reach what consequence, if any, such a potential balancing test would have on the State's ability to establish before a grand jury a prima facie case of official misconduct or theft because that question is not squarely before us.

## VII.

Our dissenting colleague concludes that the indictment should be dismissed with prejudice based on fundamental fairness grounds. She maintains that it is unfair to prosecute employees who reasonably believe that they are entitled to take employer documents to support LAD and CEPA claims. To dismiss the indictment as suggested by our colleague, however, would amount to the judiciary establishing a public policy that employees must be categorically insulated from criminal prosecution under

the theft and official misconduct statutes if they take confidential employer documents to support potential LAD and CEPA claims.  Such an approach violates the separation of powers doctrine and requires a sweeping application of the fundamental fairness doctrine beyond that currently adopted by our Supreme Court.  As we have stated in Point VI A, we leave that policy question to the wisdom of the Legislature.

The fundamental fairness doctrine applies "when the scope of a _particular_ constitutional protection has not been extended to protect a defendant."  State v. Yoskowitz, 116 N.J. 679, 705 (1989) (emphasis added); see, e.g., State v. Johnson, 127 N.J. 458, 473-74, 483 (1992) (recognizing an entrapment defense based on fundamental fairness, but reversing dismissal of the indictment under the facts of the case); State v. Gaffey, 92 N.J. 374, 388-89 (1983) (permitting dismissal of an indictment where a defendant has been deemed incompetent to stand trial, institutionalized for an "adequate period of time," and remains unfit to stand trial); State v. Sugar, 84 N.J. 1, 14 (1980) (stating that a prosecutor's eavesdropping on attorney-client communications would violate fundamental fairness); State v. Riley, 242 N.J. Super. 113, 118 (App. Div. 1990) (dismissing indictment where prosecutor breached an agreement not to use defendant-informant's statement against him); State v. Calvacca,

199 <u>N.J. Super.</u> 434, 440-41 (App. Div. 1985) (vacating part of a sentence to prevent "fundamentally unfair dual punishment").

Similarly, our Supreme Court has stated when a court may apply fundamental fairness to dismiss an indictment, such as when protections against double jeopardy do not apply, successive trials have not resulted in conviction, and the court determines that "the chance of the State's obtaining a conviction upon further retrial is highly unlikely." <u>State v. Abbati</u>, 99 <u>N.J.</u> 418, 435 (1985) (stating that a dismissing court must "accord careful consideration to the status of the individual defendant" with regard to listed factors, and remanding the case for a determination on whether dismissal was warranted based on the specific circumstances of the case); <u>see also</u> <u>State v. Dunns</u>, 266 <u>N.J. Super.</u> 349, 381 (App. Div.), <u>certif. denied</u>, 134 <u>N.J.</u> 567 (1993). <u>Cf.</u> <u>State v. Cruz</u>, 171 <u>N.J.</u> 419, 432 (2002) (holding that dismissal based on fundamental fairness was unwarranted after one jury trial resulted in a hung jury); <u>State v. Ruffin</u>, 371 <u>N.J. Super.</u> 371, 386 (App. Div. 2004) (reversing a trial court's dismissal because the elements of fundamental fairness in favor of dismissal were "wholly absent"); <u>State v. Torres</u>, 328 <u>N.J. Super.</u> 77, 94-95 (App. Div. 2000) (holding that prosecutorial

misconduct resulting in a mistrial did not warrant dismissal of the defendant's indictment).

The Court has declined to adopt a broader application of the doctrine. State v. Del Fino, 100 N.J. 154, 160 (1985) (stating that "it is by no means clear that the Appellate Division was correct in concluding that, as a matter of policy, 'fundamental fairness' itself dictates that each of [multiple] charged conspirators must receive identical treatment," such that an indictment dismissed as defective as to one co-conspirator must also be dismissed as to the other co-conspirator).

After carefully considering the record and the briefs, we conclude that defendant's remaining arguments are "without sufficient merit to warrant discussion in a written opinion." R. 2:11-3(e)(2). On this record, we therefore conclude that there was probable cause for the grand jury to find that defendant committed the crimes of theft and official misconduct.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

**SIMONELLI, J.A.D., dissenting.**

Although a defendant seeking dismissal of an indictment bears a heavy burden, the indictment in this case should be dismissed with prejudice. It is fundamentally unfair to criminally prosecute and imprison an individual for theft, N.J.S.A. 2C:20-3a, and official misconduct, N.J.S.A. 2C:30-2a[1] for taking or copying confidential employer documents while engaged in protected activity pursuant to the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14,[2] and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. The law gives no fair warning the conduct is illegal.

I begin with a brief review of the prohibitions, protections and encouragements the Legislature established in the LAD and CEPA. "[T]he essential purpose of the LAD is the

---

[1] The grand jury indicted Ivonne Saavedra for second-degree official misconduct, N.J.S.A. 2C:30-2a. A second-degree crime carries a presumption of imprisonment. N.J.S.A. 2C:44-1d. Thus, Saavedra faces a five- to ten-year term of imprisonment if convicted of this crime. Ibid.

[2] Saavedra raised her CEPA claim in the first count of her complaint, alleging she was subjected to retaliation and harassment as a result of her complaints about her employer's violations of law and public policy, including pay irregularities, employee abuse of vacation time, and violations of the Family Medical Leave Act, 29 U.S.C.A. §§ 2601-2654, the New Jersey Family Leave Act, N.J.S.A. 34:11B-1 to -16, and child study regulations.

'eradication of the cancer of discrimination.'"  Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 258 (2010) (quoting Fuchilla v. Layman, 109 N.J. 319, 334, cert. denied 488 U.S. 826, 109 S. Ct. 75, 102 L. Ed. 2d 51 (1988)) (internal quotation marks omitted).  The LAD protects not only the aggrieved employee, but also the public's strong interest in a discrimination-free workplace, and acknowledges a well-established tenet of New Jersey jurisprudence that freedom from discrimination is one of the fundamental principles of our society.  Fuchilla, supra, 109 N.J. at 334-35.

The LAD prohibits employment discrimination because of race, religion, sex, or other protected status.  Cutler v. Dorn, 196 N.J. 419, 430 (2008).  The LAD also makes it unlawful to retaliate against a person who

> has opposed any practices or acts forbidden under [the LAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the LAD] or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the LAD].
>
> [N.J.S.A. 10:5-12d.]

Our Supreme Court has emphasized that the LAD's protection against retaliation

is broad and pervasive, and must be seen as necessarily designed to promote the integrity of the underlying antidiscrimination policies of the [LAD] by protecting against reprisals any person who has sought to protect his or her own rights not to be discriminated against or who has acted to support such conduct.

[Quinlan, supra, 204 N.J. at 259 (quoting Craig v. Suburban Cablevision, Inc., 274 N.J. Super. 303, 310 (App. Div. 1994), aff'd, 140 N.J. 623 (1995)) (internal quotation marks omitted).]

In conjunction with the LAD, the Legislature designed CEPA to provide broad protections against employer retaliation for employees acting within the public interest. D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 114 (2007); Racanelli v. Cnty. of Passaic, 417 N.J. Super. 52, 56-57, 59 (App. Div. 2010). CEPA promotes "the 'strong public policy' of 'reaffirm[ing] . . . this State's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections.'" Yurick v. State, 184 N.J. 70, 77-78 (2005) (alterations in original) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)) (internal quotation marks omitted).

CEPA's "purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Abbamont, supra, 138 N.J. at 431 (emphasis

3                                                        A-1449-12T4

added). "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94 (1998). Accordingly, CEPA makes it "unlawful for an employer to retaliate against an employee who report[s] illegal or unethical workplace activities," Donelson v. DuPont Chambers Works, 206 N.J. 243, 256-57 (2011) (alteration in original) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 461-62 (2003)), and subjects employers, both public and private, to penalties, including punitive damages. Abbamont, supra, 138 N.J. at 426. "CEPA is a remedial statute that 'promotes a strong public policy of the State' and 'therefore should be construed liberally to effectuate its important social goal.'" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, supra, 138 N.J. at 431).

CEPA clearly encourages employees to report, object to, or refuse to participate in an employer's or co-employee's activity, policy or practice the employees reasonably believe violates "a law, or a rule or regulation promulgated pursuant to law," or "is fraudulent or criminal." N.J.S.A. 34:19-3a(1)-(2), c(1)-(2); see also Donelson, supra, 206 N.J. at 255-56;

Abbamont, supra, 138 N.J. 431.  "The sine qua non of a CEPA claim is not the actual occurrence of a violation of promulgated authority or public policy, but rather the existence of a reasonable belief to the effect that such authority or policy has been breached."  Mehlman v. Mobil Oil Corp., 291 N.J. Super. 98, 123 (App. Div. 1996), aff'd, 153 N.J. 163 (1998).

CEPA also clearly encourages whistleblowing employees to provide information about illegal or unethical workplace activities and protects them from retaliation for doing so. N.J.S.A. 34:19-3b.  Employees often provide information by taking or copying confidential employer documents and transmitting the documents to their attorneys, which Saavedra did in this case.

I now turn to the pertinent criminal statutes.  "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof."  N.J.S.A. 2C:20-3a.  A person is guilty of official misconduct

> when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit . . . [h]e commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner.
>
> [N.J.S.A. 2C:30-2a.]

"Unlike most crimes, as to which ignorance of the law is not material, . . . an essential element of . . . official misconduct is defendant's knowledge that the act he commits is unauthorized." State v. Grimes, 235 N.J. Super. 75, 89 (App. Div.) (citations omitted), certif. denied, 118 N.J. 222 (1989). In order for a public servant to be aware that he or she is committing an unauthorized act and thereby "fairly expose" himself or herself to prosecution for official misconduct, "there must be an available body of knowledge by which the [public servant] had the chance to regulate his conduct. The law must give a person of ordinary intelligence fair warning what conduct is proscribed, so that he may act accordingly." Id. at 89-90 (emphasis added). Thus, where an area of law or regulation is so amorphous and uncertain that persons of ordinary intelligence have no fair warning their conduct was illegal, such conduct cannot be punished with criminal prosecution. See State v. Kittrell, 145 N.J. 112, 130 (1996) (holding that criminal statutes must "clearly define the conduct prohibited and the penalties imposed" in order to satisfy the notice requirements of the Due Process Clause). We have emphatically and in no uncertain terms held that where the law gives a person of ordinary intelligence no fair warning what conduct is proscribed, "[i]n those circumstances, it is

fundamentally unfair to subject a defendant to a criminal prosecution." Grimes, supra, 235 N.J. Super. at 90. Similarly, our Supreme Court has held that

> [a] penal statute should not become a trap for a person of ordinary intelligence acting in good faith, but rather should give fair notice of conduct that is forbidden. A defendant should not be obliged to guess whether his conduct is criminal. Nor should the statute provide so little guidance to the police that law enforcement is so uncertain as to become arbitrary.
>
> [State v. Lee, 96 N.J. 156, 166 (1984) (citations omitted).]

Neither the theft statute nor the public official statute give fair warning that the taking or copying confidential employer documents while engaged in CEPA- and/or LAD-protected activity is "unlawful" or criminally "unauthorized."[3] The LAD and CEPA give no fair warning as well. In fact, CEPA does not define the word "information" or prohibit or limit disclosure of information contained in confidential employer documents.

By contrast, Quinlan permits employees to take or copy confidential employer documents under certain circumstances,

---

[3] Likewise, the Board's alleged policies and regulations relating to its confidential documents, which the State presented to the motion judge but not the grand jury, do not warn employees of any consequences, let alone criminal prosecution and imprisonment. The State never presented any evidence to the grand jury that Saavedra received or was actually aware of these alleged documents.

which the majority declined to characterize as a "theft." Quinlan, supra, 204 N.J. at 268-72.[4] Further, Quinlan only warned employees of the "significant risk" of adverse employment action, such as termination, for their self-help activities, not criminal prosecution and imprisonment. Id. at 272. Even Justice Albin recognized that employees may be justified in taking or copying confidential employer documents where the documents "clearly indicate[] that the employer was engaged in illegal conduct." Id. at 282 (Albin, J., dissenting). And there are cases where whistleblowing employees prevailed while relying on confidential employer documents. See, e.g., Mehlman, supra, 153 N.J. at 174, 176; Parker v. M & T Chemicals, Inc., 236 N.J. Super. 451, 453-54 (App. Div. 1989).

Under these circumstances, the law is so amorphous and uncertain that lay persons of ordinary intelligence acting in good faith pursuant to CEPA and/or the LAD have no fair warning it is a crime to take or copy confidential employer documents they may reasonably believe are relevant to their claims and transmit those documents to their private attorneys. Accordingly, it is fundamentally unfair to subject these

---

[4] The Court also upheld the punitive damages award, in part, because the employer "branded [Quinlan] a thief." Id. at 276.

individuals to criminal prosecution for theft and official misconduct.

The majority does not dispute that the law gives no fair warning the conduct at issue here is illegal. Instead, the majority states that the judiciary should not expand the doctrine of fundamental fairness to this case and that applying the doctrine "would amount to the judiciary establishing a public policy" categorically insulating employees who took or copied employer documents to support their LAD and CEPA claims from criminal prosecution under the theft and official misconduct statutes. Supra at ___ (slip op. at 35-38).

I do not seek to "intrude into the policy-making arena", as the majority suggests. Supra at ___ (slip op. at 29). Rather, because the law, including the theft and official misconduct statutes, provides no warning the conduct is proscribed, I suggest that the judiciary expand and apply the doctrine of fundamental fairness in order to ensure justice for all employees who act in good faith pursuant to the LAD and/or CEPA. See Zehl v. City of Elizabeth Bd. of Educ., 426 N.J. Super. 129, 137 (App. Div. 2012) (holding that "[t]he judiciary has more than a significant stake in ensuring that it is able to operate in a manner and under circumstances to meet the same policy

objective for which remedial legislation strives, that is, to ensure justice for all litigants").

The majority states, and I agree, that we must "leave to the wisdom of the Legislature further consideration of whether to amend the theft and official misconduct statutes."  Supra at ___ (slip op. at 31) (emphasis added).  It appears that applying these statutes as presently written to the circumstances of this case conflicts with the policies, prohibitions, protections and encouragements the Legislature established in the LAD and CEPA.[5] Criminal prosecution and the threat of imprisonment seem to interfere with and deprive employees of their clear rights and protections under the LAD and CEPA, and improperly insulate employers from what may be entirely legitimate claims exposing illegal or unethical conduct.  See Quinlan, supra, 204 N.J. at 268 (noting that an employer cannot insulate itself from a legitimate claim of discrimination by accusing the employee of theft of documents).  Only the Legislature can resolve this

---

[5] This conflict may also extend to the New Jersey False Claims Act (FCA), N.J.S.A. 2A:32C-1 to -17.  The FCA encourages employees to disclose confidential employer information for the purpose of filing lawsuits alleging fraud of or by State-funded entities, such as the Board in this case.  As with the LAD and CEPA, the Legislature has prohibited employers from taking adverse employment action against employees who disclose confidential employer information pursuant to the FCA.  N.J.S.A. 2A:32C-10b.  However, there is nothing prohibiting criminal prosecution of these employees for theft and official misconduct.

conflict. Until the Legislature does so, however, the doctrine of fundamental fairness should apply to preclude criminal prosecution in this case.

For these reasons, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1449-12T4